42263.   APPLING et al. v. JONES.

ARGUED SEPTEMBER 9, 1966—DECIDED FEBRUARY 14, 1967—
REHEARING DENIED FEBRUARY 27, 1967—

302

*Whelchel & Whelchel, James C. Whelchel,* for appellants.

*Reinhardt, Ireland, Whitley & Sims, Glenn Whitley,* for appellee.

FELTON, Chief Judge. █  The overruling of the general demurrer to the petition as amended is enumerated as error.

"In actions for wrongful death, as in the case of actions for personal injuries generally, it is essential to a recovery of damages that the wrongful act or default of the defendant shall have been the proximate cause of the death resulting therefrom.

Death by suicide gives rise to a specific problem in regard to the question of the extent to which liability for the consequences of defendant's act shall be carried. As a general rule a person will not be relieved of liability by an intervening force which could reasonably have been foreseen, nor by one which is a normal incident of the risk created. However, if such intervening force takes the form of suicide, the practically unanimous rule is that such act is a new and independent agency which does not come within and complete a line of causation from the wrongful act to the death and therefore does not render defendant liable for the suicide." 11 ALR2d 751, 757, § 4. As to the elements and tests of proximate cause, see 65 CJS 1151, 1163, Negligence, §§ 107, 109; *Blunt v. Spears*, 93 Ga. App. 623 (92 SE2d 573); *Gregory v. Ross*, 214 Ga. 306, 311 (104 SE2d 452). The Georgia case of *Stevens v. Steadman*, 140 Ga. 680 (79 SE 564, 47 LRA (NS) 1009), cited in 11 ALR2d, supra, p. 757, § 4, is an even stronger case than that *sub judice*, in that it denied liability for a calculated, deliberate and wrongful conspiracy which, it was alleged, caused death by suicide, whereas the present case involves merely negligence on the part of defendants. The same general rule prevails as to situations involving negligence as a causative factor. "According to all the cases in point the general rule is that where injuries resulting from the negligence of a third person produce a state of mind in the injured person which leads to his suicide, the person guilty of the negligence is not civilly responsible for the suicide." 11 ALR2d 751, 758, § 5, and cit.; 22 AmJur2d Damages, § 34.

"However, where the wrongful act produces such a rage or frenzy that the injured person destroys himself during such rage or frenzy, or in response to an uncontrollable impulse, the act is considered as within and a part of the line of causation from defendant's negligent injury to the death, and the defendant's act is the proximate cause of death." 11 ALR2d 751, 758, §§ 4, 5; Prosser, Law of Torts, pp. 273, 274. The latter limitation of the above general rule has been recognized in a number of cases and was the basis of the decision in the case of *Elliott v.*

*Stone Baking Co.,* 49 Ga. App. 515 (176 SE 112), which expressed the requisite condition of the deceased in slightly different terms, to wit: "1. Where, as the proximate result of an injury upon his head caused by the negligence of another, the person injured becomes *insane* and *bereft of reason,* and while in this condition and as a result thereof he takes his own life, his act is not a voluntary one, but is involuntary, and is not an act which breaks the causal connection between the homicide and the act which caused the injury, and the latter act is the proximate cause of the homicide. [Citations]. 2. Where it is alleged in the petition in a suit by a wife to recover for the homicide of her husband that he received physical injuries about the head as a result of the defendant's negligence in hitting him with an automobile, that the injuries caused him to become *mentally irresponsible* and *insane,* that while in this insane condition and as a result of this condition, he killed himself by shooting himself in the head, that his death was proximately caused by the alleged negligence of the defendant, and that the plaintiff was therefore damaged in the amount of the value of the husband's life, the petition set out a cause of action." (Emphasis supplied.) Although the allegations of the present plaintiff's decedent's condition at the time of his suicide, i. e., "dazed," "stunned," "shocked," "extremely irrational" and "violent," are not identical to the conditions involved in *Elliott v. Stone Baking Co.,* 49 Ga. App. 515, supra, and other such cases, i.e., "rage," "frenzy," "delirium," "in response to an uncontrollable impulse," "without conscious volition to produce death," "insane," "bereft of reason" and "mentally irresponsible," they are sufficient to place the petition within the ambit of the rule in these cases. The petition, therefore, stated a cause of action and the court did not err in its judgment overruling the general demurrer to the petition as amended.

■ The following evidence relative to the decedent's condition and state of mind at the time of his suicide was adduced at the trial: After the collision, decedent was in the bedroom of the Appling home, where the collision victims were lying, and after being.requested to do so, he ran and got a towel to help stop

their bleeding. He made the statement that the people needed a doctor. Additional people came into the room and the boy walked into the living room. He sat there for a few minutes, then got up and went to the telephone and dialed, hung the telephone up, went back to the telephone again, dialed and hung up, again came into the room and walked around a short while, then went to the telephone, picked up the receiver, hung it back up and said "what's the use?" Until that time, he did not seem any more nervous or upset than anyone else would have been who had been in a fairly serious accident. After the attempted telephone calls, he began to walk around in a "pretty highly state of shock like or nervous like, what I mean he wasn't raging or anything but he was walking around seemingly *pretty* highly nervous, but not in a *highly* nervous condition." He was approached and asked if he was hurt, to which he replied that he was not and wanted to be left alone. Notwithstanding this reply, he was seized by both arms and begun to be led out of the Appling house to the ambulance by the ambulance driver and a private citizen. When they reached the front porch, the boy jerked away from those who were holding him against his will and jumped through the screen which enclosed the porch. In the front yard, a state patrolman investigating the collision took the boy by the arm and asked him what the trouble was, to which the boy replied, "If you had done what I've done you would know." In answer to the patrolman's question, the boy told him he was not hurt. Neither this patrolman nor the other witnesses who saw the boy prior to his death noticed any injury, bruise, mark, contusion or abrasion on him. The only evidence of such injury was by witnesses who viewed his body after he had shot himself and fallen face down on the ground, possibly thereby sustaining the bump on the forehead which they observed. Although the boy was nervous and excitable following the collision, those who talked with him testified that his speech was rational and plainly understandable. In replying to the trooper's query as to how the collision had occurred, he told him that "I was coming down the road and bam, that's all I know." He exhibited his driver's license upon request and when

asked who his parents were he said he knew who they were but couldn't tell the trooper. Subsequently, several witnesses observed the boy, walking rapidly between the automobiles on the highway near the scene of the collision, taking long, high steps and swinging his arms real high. When one of the troopers asked him to sit down in the back seat of the automobile the boy had been driving, he complied with the request. Again, a little later, when asked by a trooper to get in the back seat of the patrol car, the boy obeyed, carrying on a brief, normal conversation with the trooper. At about 9:30 p.m., almost two hours after the collision, the boy shot himself in the chest with a rifle which was normally carried in a scabbard on a metal rack on the inside of the right front door of the patrol car. There was medical testimony, based on hypothetical questions in turn based on evidence as to decedent's behavior, that there could be a causal connection between the collision and the suicide. However it was also testified that the decedent's behavior could have been caused by emotional upset.

Certainly, a serious accident such as this one, wherein the plaintiff's decedent not only was shaken up himself but actually saw and assisted in administering to the needs of the injured and bloodied victims, was enough to have an appreciable effect on this young, seventeen-year-old boy, and might easily explain his nervousness, pallor, emotional upset and other unusual behavior. There is too much evidence of his rational, conscious behavior after the collision, however, to find that his act of suicide was committed in a "rage," "frenzy," or "delirium," or "in response to an uncontrollable impulse," while "insane," "bereft of reason," "mentally irresponsible," or "without conscious volition to produce death." His wandering through the Appling home, looking in closets and emptying drawers could well have been connected with his search for towels or other items to assist with the care of the injured parties. His asking several times where the telephone was might be explained as a temporary lapse of memory due to his recent, harrowing experience, the fact that he was in a strange house, and his distraction caused by his apparent sense of

guilt and was not sufficient to indicate a complete lack of reason or awareness of the consequences of his acts. His resistance to being bodily forced into an ambulance by two adult men after he had said he was not hurt, asked to be left alone, and exhibited no outward manifestations of physical injury is certainly comprehensible as a normal reaction. Throughout the period between the collision and the suicide he responded coherently and rationally to questions and requests and apparently was completely aware of the situation. His refusal to divulge his parents' names and his statement that "if you had done what I've done you would know" what the trouble was, are indicative of a deep sense of guilt, which would not have been justified by his role in the collision, since the evidence shows not only that he was not at fault in the collision but also that he had rendered whatever aid he could to the injured parties afterwards. Even if his feeling of guilt was somehow related to the collision, however, his subsequent intervening act of suicide was certainly not such a usual or foreseeable consequence or normal incident of such a collision as to make the defendants' negligence actionable. The evidence failed to show the requisite state of mind of being bereft of reason and sanity as to be not responsible for his own act of suicide.

The verdict and judgment in favor of the plaintiff were not authorized by the evidence; therefore, the court erred in its judgment on the motion for a judgment n.o.v. *Allen v. Rome Kraft Co.*, 114 Ga. App. 717 (152 SE2d 618).

*Judgment reversed with direction. Frankum, J., concurs. Pannell, J., concur specially.*

PANNELL, Judge, concurring specially. The enumerations of error, pertaining to the questions here decided, were as follows: "2. The court erred in overruling the defendant's motion for a directed verdict. 3. The court erred in overruling the defendants' motion for a judgment notwithstanding a verdict." The court has passed upon Enumeration of error 3. In my opinion, since the appeal is from the judgment upon the verdict, no enumeration of error on the actions or rulings of the court thereafter can be considered or passed upon by this court. I

have expressed these views in full in a dissenting opinion in *Allen v. Rome Kraft Co.*, 114 Ga. App. 717, supra. Under appellate practice prior to the Appellate Practice Act of 1965 as amended no assignments of error upon any action of the trial judge occurring after the judgment appealed from could be considered on the appeal (by bill of exceptions). There is no language in the Appellate Practice Act, and none was cited by the court in *Allen v. Rome Kraft Co.* which changes the law in this regard. Regardless of the opinions I entertain, however, I am bound by the decision of the majority of this court considered by the full court in *Allen v. Rome Kraft Co.*, supra. For this reason and for this reason only do I concur in the judgment.