Arlene DRAKE, Administratrix and Personal Representative of the Estate of Susan Paige Drake, Appellant,

v.

WAL–MART, INC., Dixie Rice, and Frank Vermeire, Appellees.

Arlene DRAKE, Administratrix and Personal Representative of the Estate of Susan Paige Drake, Appellee,

v.

.WAL–MART, INC., Dixie Rice, and Frank Vermeire, Appellants.

Nos. 79525, 79553.

■

Court of Appeals of Oklahoma, Division No. 1.

March 15, 1994.

Rehearing Denied April 15, 1994.

Certiorari Denied June 7, 1994.

Paul S. Martin, Boettcher & Ryan, Ponca City, for Arlene Drake.

Roy A. Jacobson, Jr., and Heather Noble, Spence, Moriarity & Schuster, Jackson, pro hac vice for Arlene Drake.

Jon B. Comstock, Gerald M. Bender, and Thomas A. Le Blanc, Jon B. Comstock & Associates, Tulsa, for Wal–Mart Stores, Dixie Rice, and Frank Vermeire.

## MEMORANDUM OPINION

ADAMS, Judge:

In Case No. 79,525, Arlene Drake, the mother and personal representative of Susan Paige Drake (Decedent), appeals a trial court judgment in favor of Wal–Mart, Inc., and its two employees,[1] Frank Vermeire and Dixie Rice, in this wrongful death action. Drake claimed Wal–Mart is liable for selling Decedent, who was nineteen years old, the handgun which she allegedly used to take her own life. On appeal, Drake argues the trial court should not have granted summary judgment because controverted factual issues remain. Because the uncontroverted facts and all reasonable inferences, when considered in the light most favorable to Drake, are consistent only with judgment for Wal–Mart, we affirm.

---

1. Since there is no question that the employees were acting in the course and scope of their employment, our references to Wal–Mart apply equally to the employees.

In Case No. 79,553, Wal–Mart appeals trial court orders requiring it to pay expert witness fees and travel expenses. Because we conclude the trial court did not abuse its discretion, we affirm.

■ At the outset we must consider a pending motion upon which the Oklahoma Supreme Court deferred action, awaiting merits review. When Drake filed her Brief in Chief on August 31, 1992, she attached evidentiary materials, including articles from psychological journals and studies concerning suicide, which admittedly were not presented to the trial court. On November 19, 1992, the Oklahoma Supreme Court entered an order striking Drake's Brief in Chief ·and requiring Drake to file amended briefs which did not include the attachments. On November 30, 1992, Drake filed amended briefs and omitted the attachments, but did not alter the text which discussed and made reference to the stricken materials.

On December 10, 1992, Wal–Mart asked that Drake's briefs be stricken and her appeal be dismissed, or, in the alternative, that the briefs be stricken and Drake be allowed time to file amended briefs. Wal–Mart argued that Drake had failed to comply with the November 19 order. On December 22, 1992, the Oklahoma Supreme Court entered an order deferring action on whether the briefs should be stricken in toto, and ordering that "materials not properly included or referenced will be stricken and not considered on appeal."

In our review, we have experienced no difficulty in excluding from consideration arguments based upon materials not presented to the trial court. Wal–Mart's motion is denied.

## DRAKE'S APPEAL

According to Drake, the evidentiary materials support a conclusion that Wal–Mart is liable because its sale of the handgun to Decedent violated two statutes, 18 U.S.C. § 922 and 21 O.S.1991 § 1289.12. The federal statute prohibited Wal–Mart from selling Decedent any firearm other than a rifle or shotgun. The state statute prohibited Wal–Mart from knowingly selling, trading, trans-

mitting or causing the transfer of a rifle, shotgun, or pistol to Decedent if she was a "convicted felon" or an "individual who is under the influence or alcohol or drugs or is mentally or emotionally unbalanced or disturbed."

Wal–Mart argues that neither of these criminal statutes imposes civil liability. In addition, Wal–Mart claims Decedent's voluntary act of suicide superseded and cut off any liability based upon Wal–Mart's alleged negligence, citing Runyon v. Reid, 510 P.2d 943 (Okla.1973). Although we do not agree that Runyon recognizes as inflexible a rule as Wal–Mart would have us apply, Runyon does make it unnecessary to determine whether the statutes upon which Drake relies created a private right of action.

■ In Runyon, a pharmacist illegally refilled a prescription for barbiturates without physician approval. Mr. Runyon used those pills to commit suicide. In concluding that the pharmacist was not liable as matter of law the Court concluded that "a pharmacist who refills a 'non-refillable' drug prescription should not in all circumstances be liable for the death of a purchaser who uses the drugs so obtained to commit suicide." Runyon, 510 P.2d at 950. In so holding, the Court quoted from Riesbeck Drug Co. v. Wray, 111 Ind.App. 467, 39 N.E.2d 776, 781 (1942) which stated:

> The voluntary, willful act of suicide of an insane person, who knows the purpose and physical effect of his act, is such a new and independent agency as will not come within and complete a line of causation from a defendant's alleged negligent act in making sale of a substance or instrumentality with which human life may be taken, when there is nothing in the conditions or circumstances to indicate to the seller that the substance or instrumentality will be used for such purpose. Death by self-destruction is not a result naturally and reasonably to be expected, solely, from the sale of substances or instrumentalities with which human life can be taken.

Although the sale of the drug to Mr. Runyon was illegal, the Court nevertheless concluded that the pharmacist was not liable

because the plaintiff had not "alleged that there was anything in the circumstances of the sale which should have made [the pharmacist] aware that decedent intended to use the [barbiturate] to commit suicide." *Runyon*, 510 P.2d at 950. *Runyon* teaches, then, that an illegal sale of an instrumentality which could be used for suicide cannot create liability where the seller had no reason to expect that instrumentality to be used for that purpose.

However, we do not agree with Wal–Mart that *Runyon* establishes that all voluntary suicides break the causal chain. As we read *Runyon*, the Court neither accepted nor rejected the concept that civil liability may arise when the seller had reason to expect that the instrumentality would be used to commit suicide. Similarly, we need not decide that issue because the facts revealed by the evidentiary materials presented to the trial court, considered in the light most favorable to Drake, together with all reasonable inferences therefrom, are consistent only with the conclusion that Wal–Mart and its employees had no reason to know that Decedent intended to use the handgun to take her own life. *See Hargrave v. Canadian Valley Electric Co-op.*, 792 P.2d 50 (Okla. 1990).

Decedent, who appeared seriously underweight, entered the store shortly before closing and approached the counter where guns were sold. Vermeire assisted Decedent. Decedent did not know the particular type of handgun which she desired and was initially reluctant to touch or handle the weapons which Vermeire showed her. According to Vermeire, this reluctance was not extraordinary for a woman purchasing a handgun. Ultimately, Decedent did handle the weapon she purchased and demonstrated she understood how to insert and remove the ammunition clip and prepare the weapon for firing. Rice, Vermeire's supervisor, also assisted and asked Decedent why she was purchasing

the gun. According to Rice's undisputed testimony, Decedent told her that she lived in a rough area and wanted the gun for self-protection. Rice told Decedent about a local class on firearm use, and Decedent indicated she might inquire about it. Rice also testified that Decedent was nervous and fidgety. After Decedent paid for the weapon and during a delay while Wal–Mart employees were locating appropriate packaging materials for the weapon and ammunition, Decedent asked Vermeire if she could cancel the sale and get her money back. Vermeire told her she could, but Decedent indicated she wanted. the gun. Both Vermeire and Rice testified that Decedent did nothing to hide her age, and the birthdate on her driver's license and on the federal form which she filled out indicated she was nineteen.

Another customer (Customer) was also in the area when Decedent made her purchase. According to his testimony, he did not hear any of the conversation between Decedent and the clerks, but Decedent "acted as if she wasn't listening to" Vermeire. Customer also indicated Decedent "looked blank or vacant," and seemed upset or troubled. Customer also testified that he "never saw any sign that would indicate that [Decedent] was going to commit suicide."

Based on this information, and the testimony of a gun dealer and a psychologist, Drake contends there is a controverted fact question whether Wal–Mart should have known Decedent was going to use the weapon purchased to take her own life. However, although both the gun dealer and the psychologist testified that some of Decedent's actions were "red-flags" which should have alerted Wal–Mart to make further inquiries of Decedent, neither witness testified that Wal–Mart should have known that Decedent was going to commit suicide.[2]

Under *Runyon*, Wal–Mart cannot be liable if it should not have known that the handgun

---

2. The gun dealer, Mr. Roberts, testified that the gun should not have been sold because Decedent was not twenty-one and because of her "fidgetiness, and her unwillingness to handle the gun." The psychologist, Dr. Cantor, testified that it would not have been unusual for anyone "seeing an upset teenage girl or young woman who is

upset" to "think about suicide as a possibility." However, Dr. Cantor went on to state: "Now if you wish to push that further to a different conclusion, could I tell you that this clerk, either clerk, should have known that she would commit suicide, I would answer no."

which it illegally sold to Decedent would be used to commit suicide. On the evidentiary material presented to the trial court, reasonable persons could only conclude that Wal–Mart could not be reasonably expected to foresee Decedent's self-destructive act, and summary adjudication was appropriate.

## WAL–MART'S APPEAL

Wal–Mart's appeal involves two trial court orders. In the first, the trial court determined, over the objection of Wal–Mart, that Mr. Roberts, the gun dealer, was an expert witness and therefore Wal–Mart was required to pay him an expert witness fee and travel expenses for his deposition. In the second order, the trial court set Dr. Cantor's expert witness fee at $2,500, an amount which Wal–Mart contends was unreasonable.

■ Wal–Mart contends Mr. Roberts was entitled to no more than the statutory lay witness fee of five dollars because, according to Wal–Mart, he was not an appropriate expert witness. Citing *Gabus v. Harvey*, 678 P.2d 253 (Okla.1984), Wal–Mart argues Mr. Roberts' "expertise" would not be helpful to a jury because a jury would be just as capable of drawing conclusions from the evidence concerning what a reasonable gun dealer might anticipate as was Mr. Roberts.

However, there is an important distinction between the subject of Mr. Roberts' testimony and that of the police officer in *Gabus*. The *Gabus* witness testified about actions within the common knowledge of most jurors, driving a motor vehicle. Mr. Roberts would testify about actions of which many jurors would have no knowledge, selling a weapon. As noted in *Gabus*, a trial court's ruling on the admission of expert testimony will not be disturbed on appeal absent a clear abuse of discretion. Wal–Mart has not demonstrated that the trial court abused its discretion in determining that Mr. Roberts' testimony was a proper subject for expert testimony and that Mr. Roberts was an expert by reason of his specialized knowledge and experience. *See* 12 O.S.1991 § 2702. There-

fore it was not error to order Wal–Mart to pay an expert witness fee.

Wal–Mart also argues that Drake should have been required to pay a portion of Mr. Roberts' travel expense because both parties benefited from his presence in Oklahoma at the time of the deposition. In the trial court, Wal–Mart contended Drake's counsel had agreed to share those expenses but produced no evidence of such an agreement. Further, Wal–Mart has cited no authority which allows one party to impose upon an opposing party the travel expenses for a witness deposed by the first party. We cannot conclude that the trial court abused its discretion in denying Wal–Mart's request.

■ For reversal of the order relating to Dr. Cantor, Wal–Mart argues the fee awarded by the trial court, $2,500, is unreasonable. The fee is authorized under 12 O.S.1991 § 3226(B)(3)(c)(1) which requires the party seeking discovery from an expert for another party to pay the expert "a reasonable fee for the time spent in responding to discovery."[3] We review a trial court's ruling on a discovery dispute under this provision by the "abuse of discretion" standard. *See R.J.B. Gas Pipeline Co. v. Colorado Interstate Gas Co.*, 813 P.2d 14 (Okla.App. 1990).

According to the record, Dr. Cantor advised Wal–Mart's counsel shortly before beginning her deposition that her charges would be $1,250 if the deposition lasted four hours or less and $2,500 if the deposition lasted more than four hours. The parties agree that the deposition lasted four hours and twenty minutes. In addition, Dr. Cantor expended one and one-half hours after the deposition responding to discovery requests made by Wal–Mart's counsel in the deposition. Although Dr. Cantor billed Wal–Mart for $2,500 for the deposition time and an additional $375 for the post-deposition time, the trial court approved a total fee of $2,500.

■ Relying on the reasoning in *Anthony v. Abbott Laboratories*, 106 F.R.D. 461 (D.R.I.1985), which applied a similar federal

---

3. This applies only to discovery from an expert conducted pursuant to 12 O.S.1991 § 3226(B)(3)(a)(2) and (B)(3)(b).

provision, Wal–Mart argues hourly compensation of $625 [4] is exorbitant. We agree with the view, expressed in *Anthony*, that in setting a reasonable expert fee, the ultimate goal is balance, so that parties will not be hampered in their efforts to attract competent experts, while at the same time the opposing parties will not be burdened by excessive fees which produce windfalls for the experts. *Cf., Hensley v. Eckerhart*, 461 U.S. 424, 430 at n. 4, 103 S.Ct. 1933, 1938 at n. 4, 76 L.Ed.2d 40 (1983), (examining fees for counsel under 42 U.S.C. § 1988).

However, there are important distinctions between the record in this case and the one in *Anthony*. First, the Anthony record reflected that the expert had recently charged a "friendly" litigant $250 per hour for a deposition but wanted to charge $420 per hour to Ms. Anthony's opponent. Second, the Anthony expert had no "discernible overhead." Third, the Anthony record contained no indication of "manifest inconvenience or consequential loss" to the expert.

The same cannot be said of this record. Wal–Mart offered no evidence of what Dr. Cantor charged for other depositions, or, for that matter, any evidence of what similar experts would charge. This record is silent on whether Dr. Cantor has overhead, but it is undisputed that attendance at the deposition did require Dr. Cantor and her husband to incur material inconvenience and possible financial loss.[5] Further, although the deposition was taken in Boston, near where Dr. Cantor lived, her affidavit indicates she made special arrangements to travel to Boston the night before her deposition to avoid any possible winter weather interference with her appearance.

Considering all of these factors, and in the absence of any evidence that Dr. Cantor's fee was out-of-line with that charged by similar experts to "friendly" or "unfriendly" opponents, we cannot say the trial court abused its discretion in approving a fee of $2,500.

---

4. In calculating this hourly rate, Wal–Mart ignores the fact that the deposition lasted longer than four hours and does not include Dr. Cantor's post-deposition time spent responding to Wal–Mart's request for additional documents. Including all of that time, and not any travel time, the hourly rate is approximately $430.

## CONCLUSION

None of the parties has presented a record requiring reversal of the trial court's judgment. The trial court's judgment is therefore affirmed.

AFFIRMED.

JONES, P.J., concurs.

HANSEN, J., dissents.

---

5. According to Dr. Cantor's undisputed affidavit testimony, her child was ill and required twenty-four care. Dr. Cantor's husband stayed with the child on the day of the deposition and missed work.