**Linda B. KNIGHT, as Next Friend
of Bridgett Brown, Plaintiff,**

v.

**WAL–MART STORES, INC., Defendant.**

Civ. A. No.   394–021.

United States District Court,
S.D. Georgia,
Dublin Division.

May 11, 1995.

Steven Mitchell Harrison, Rita Josephine Llop, Eastman, GA, for plaintiff.

Robert A.B. Reichert, Anderson, Walker & Reichert, Macon, GA, Howard M. Lessinger, Albert J. DeCusati, McLain & Merritt, P.C., Atlanta, GA, for defendant.

## ORDER

EDENFIELD, Chief Judge.

Before the Court is Defendant Wal–Mart's motion for summary judgment on Plaintiff Knight's claim that Wal-mart is liable for selling a firearm to a mentally incompetent customer who later killed himself with it. For reasons discussed below, the motion is **GRANTED** as to federal statutory liability and **DENIED** as to common law liability.

### I. Summary Judgment Standard

Summary judgment is appropriate only when the pleadings, depositions and affidavits submitted by the parties show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.Proc. 56(c). The

evidence and any inferences drawn from it should be viewed in the light most favorable to the nonmovant. *Mercantile Bank & Trust Co., Ltd. v. Fidelity & Deposit Co.,* 750 F.2d 838, 841 (11th Cir.1985). The party seeking summary judgment must first identify grounds which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmovant, who must reach beyond the pleadings and present affirmative evidence to show that there in fact is a genuine issue of material fact requiring a trial. *Thompson v. Metro. Multi–List, Inc.,* 934 F.2d 1566 (11th Cir.1991). *See also United States v. Gilbert,* 920 F.2d 878 (11th Cir.1991). A mere "scintilla" of evidence supporting the nonmovant's position, however, will not suffice. *Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir.1990). The non-movant "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).

## II. Facts

On March 25, 1992, Eric Brown entered the Walmart in Eastman, Georgia. Lisa Edwards, an employee at the store, testified that after noticing Brown, she announced a security code to all departments. L. Edwards Affid. ¶ 6; L. Edwards Dep. at 42–43. Apparently this was standard procedure every time Brown entered the establishment. *Id.* Another employee, April Wilcox, testified that Brown

walked to the front of the store and stood in front of my register. He looked like he was in a rage. He also appeared rushed, upset and in a hurry and he was talking to

himself. Then he turned and rushed back to the back of the store again. When he looked at me, I was afraid of him and I knew he was crazy.

Wilcox Affid. ¶ 4. The accuracy of these accounts is not disputed by Wal-mart, which argues only that they are not relevant.

Brown eventually went to the sporting goods department, in which Patricia Nutt was working that day, and asked to look at a rifle.[1] A different employee showed Brown a weapon that he decided to purchase, and Nutt was asked to assist in completion of the sale. Nutt gave Brown Treasury Form 4473 (U.S. Firearms Transaction Record), a federal form that must be completed by the customer before a firearm may be sold. *See* 27 C.F.R. § 178.124. Brown was told the purpose of the form and how to complete it. With regard to questions 8(a)-(h) of section A of the form, he was told to initial each to show that he understood the questions posed. Brown completed section A, answering "no" to all questions, including question 8(e), which asked whether the purchaser had ever been adjudicated mentally defective or committed to a mental institution.[2] This was a lie—Brown had previously been institutionalized. *See* Pltf.Resp. to Mtn. for Sum.Judg. at Exh. C.[3]

After completing the form, Brown had not initialed his answers. Nutt once again asked him to do so, and he complied. He then signed the form. Nutt then completed section B of the form. Part B(9) required the seller to state the type of identification used by the purchaser, usually a driver's license. Brown indicated that he did not drive, and produced a valid Georgia State Identification

---

1. Most of this recitation is drawn from the affidavit of Ms. Nutt.

2. The Court finds no genuine dispute over whether Brown was competent to understand and complete either the forms or the purchase. Plaintiff claims otherwise, but does not provide any evidence in support. Meanwhile, the act of going to the store, perusing the available weapons, choosing one, asking to buy it, completing the necessary federal form, producing valid identification upon request, and finally paying for it, all strongly imply at least that mental competence necessary to understand what is occurring

and the significance of those events. Mr. Brown obviously intended the purchase, because he then bought bullets for the gun and went home to take his own life.

3. Wal-mart protests that Plaintiff's submission of evidence on Brown's psychiatric history was improper. The point is moot, however. The evidence is clear that Brown was adjudicated and/or committed within the meaning of 18 U.S.C. § 922(d)(4), and the Court's resolution of the federal liability issue does not depend on a finding on this point.

Card.[4] A manager, Anisa Berry, was finally called to approve the sale, as required by Wal-mart policy. She did so.

At this point Brown tried to buy ammunition for the rifle, but Ms. Nutt explained that it was Wal-mart policy not to allow the purchase of ammunition with a new firearm. Nutt says Brown remained calm, acknowledged that he understood the policy, and paid for the rifle. After the sale, again according to store policy, Nutt escorted Brown to the front of the store, where she gave him his purchase as he exited the establishment.

On the way out, Nutt gave the gun to Ms. Edwards, stationed at the service desk, who removed the security tape from it. Brown then asked for a bag for the package. At this moment, Nutt claims that she got a bag, walked him out, and gave him the bag with the rifle in it. As she re-entered Wal-mart, she claims that Ms. Edwards said to her, "Was that Eric Brown?," to which Nutt replied, "Yes." Edwards then responded, "He's crazy," and laughed. Nutt asserts that Edwards used this term often and loosely, and so Nutt thought nothing of it. She further claims that she was unaware of the store-wide security alert, and even if she had been aware of it, such alerts usually related to a known shoplifter. Employees usually became more watchful in response, but did not necessarily know what individual was implicated. *See also* L. Edwards Dep. at 43, 47.

Ms. Edwards remembers Mr. Brown's exit from the store differently. She testified that *before* she removed the security tape from the weapon and gave it to Ms. Nutt, she said to Ms. Nutt, "He's crazy. Y'all sold him a gun?" L. Edwards Dep. at 37; L. Edwards Affid. ¶ 7. Nutt replied that "he had an ID [sic] and that she had to follow company policy and sell the rifle to him." *Id.* Ms. Nutt *then* walked Brown out of the store. Edwards then testified that Ms. Nutt re-entered the Wal-mart after Brown left, found a manager, and both of them went outside to look for Brown. L. Edwards Affid. ¶ 8. Brown had already pedalled away on his bicycle, however, and the two employees returned to the store.

Brown then proceeded to Horn's Bait & Tackle Shop, which is not named in this suit, and bought bullets. He then pedalled home, assembled his new rifle, loaded it, and shot himself in the head. He died from the wound.

The mother of Mr. Brown's only child filed suit in Dodge County Superior Court two weeks later, claiming that Wal-mart breached its common law duty of care and the statutory requirements of the Gun Control Act of 1968, 18 U.S.C. 922(d)(4). This act makes it unlawful for "any person to sell ... any firearm ... to any person knowing or having reasonable cause to believe that such person ... has been adjudicated as a mental defective or has been committed to any mental institution." Wal-mart removed the case to federal court, 28 U.S.C. § 1441, citing federal question jurisdiction. *Id.* § 1331. It was re-assigned to this Court on January 20, 1995.

### III. Law

#### A. Legal Bases for Recovery

The two potential avenues to establishing liability in this case are the Gun Control Act and negligence, the latter via the Georgia wrongful death statute. O.C.G.A. § 51–4–1 et seq. Within statutory law, there are issues of whether this case falls within that class of cases Congress intended to reach with the Act, and whether Wal-mart breached its duty under it. Within common law, the theory of liability is negligent entrustment: the Court must again decide if Walmart breached its duty, *i.e.*, if a reasonable person would have foreseen that Mr. Brown would hurt himself or others with the rifle he sought to purchase. Under both the state and federal laws there is an issue of proximate causation. If Wal–mart is found liable

---

4. Despite Plaintiff's implications and the Wal-mart store policy, a driver's license is not the only valid form of identification for purposes of buying a firearm. Treasury Form 4473 itself states that other identification may be sufficient, and 27 C.F.R. § 178.124(c)(1) requires only that the purchaser "be identified in any manner customarily used in commercial transactions (e.g., a driver's license)[.]" *See also Bolus v. Saybrook Gunshop, Inc.*, 30 Ohio App.3d 23, 30 OBR 61, 506 N.E.2d 253 (1985).

for negligence, the state wrongful death statute authorizes recovery of the full value of Brown's life.

■ Any liability for Wal-mart in this case will result from its position as employer of two persons: Patricia Nutt, the employee who sold Brown the rifle, and Lisa Edwards, the employee who removed the security tape from the rifle and returned it to Ms. Nutt, thus allowing her to give to Brown as he left the store. Liability rests on the doctrine of *respondeat superior:* the employer is liable for torts of its servants when the servants are acting within the scope of the employer's business. *See* O.C.G.A. § 51-2-2; *Carter v. Bishop,* 209 Ga. 919, 76 S.E.2d 784 (1953); *Spencer v. McCarley Moving Co.,* 174 Ga. App. 525, 330 S.E.2d 753 (1985). At issue here is the claim that Wal-mart employees negligently entrusted Mr. Brown with a weapon. Both Ms. Nutt and Ms. Edwards participated in this entrustment. Ms. Nutt by performing the sale, Ms. Edwards by assisting its completion. The knowledge of these two women and their actions in light of it will determine Wal-mart's liability.

■ The actions or knowledge of Ms. Wilcox, another Wal-mart employee who was aware of Mr. Brown on the day he bought the rifle, cannot establish liability for Walmart. She did not participate in the sale of the rifle to Brown; she could not even know Brown had purchased a weapon.

Plaintiff cites *Freeman & Sons, Inc. v. Stanley,* 189 Ga.App. 256, 258, 375 S.E.2d 261 (1988), *rev'd in part,* 259 Ga. 233, 378 S.E.2d 857 (1989), and *American Oil Co. v. McCluskey,* 119 Ga.App. 475, 476, 480, 167 S.E.2d 711 (1969), for the proposition that the knowledge of every Wal-mart employee should be imputed to Wal-mart and considered when deciding if Wal-mart had knowledge of Brown's mental illness. The two cases, however, are inapposite: *Freeman,* a negligent hiring/retention case, stands for the proposition that the knowledge of an employee's superior concerning potentially harmful acts by that employee is attributable to the corporation if it is sued. *American Oil* makes the analogous point that a corporation cannot avoid liability for an employee's negligent behavior in the course of his employment by claiming that it did not know about it. In both decisions, the issue is the master's knowledge of the negligence of its servant. In the instant case, Plaintiff improperly extends the principle to cover employees other than the one causing injury.

## B. The Gun Control Act of 1968

■ Though both sides address the issue, the Court does not decide whether suicide falls within the class of cases Congress sought to reach with this Act, because even if suicide is encompassed by the Act, there is no evidence that Ms. Nutt knew Mr. Brown had previously been committed to a mental institution, and there is insufficient evidence to show that she had reasonable cause to believe it. This is so even construing the available evidence in a manner most favorable to the Plaintiffs. Though the Court finds below that there is a genuine issue of fact as to whether Ms. Nutt should have *predicted the harm* resulting from the purchase, it is important to realize that foreseeing future harm is far different than having reason to believe that a person has, at some point in the past, *been legally adjudicated mentally defective or been formally committed.* There are clearly many more potentially dangerous, mentally imbalanced individuals than have been formally adjudicated as such or institutionalized for it.

The plain language of § 922(d)(4) relates specifically and exclusively to the latter group of people. It does not simulate the common law duty of due care. It is a statute providing that a dealer has committed a crime if he sells a firearm to a customer when he has "reasonable cause to believe that [the customer] ... has been adjudicated as a mental defective or has been committed to any mental institution." That standard criminalizes a certain act, and on the civil side, courts have decided that failing to meet the standard constitutes negligence *per se.* *See Decker v. Gibson Products,* 679 F.2d 212, 215 (11th Cir.1982); *West v. Mache of Cochran, Inc.,* 187 Ga.App. 365, 367, 370 S.E.2d 169 (1988). But the standard, even when used for civil liability, is more favorable to dealers than the common law negligence standard—it requires reason to believe that a

particular event occurred in the past, *not* reason to believe that harm might occur in some foreseeable future. The set of evidence that could lead one to believe the latter is far broader than, that which would reasonably imply the former.

Plaintiffs have produced no evidence implying that Nutt could have known about Brown's prior institutionalization, and Brown affirmatively lied about it when asked on the federal form. He even initialled his false answer, verifying that he had reviewed it and believed it to be true. There is no indication that anyone ever told Ms. Nutt that Brown had been institutionalized, even if other employees firmly believed that the man was strange. At most, Ms. Nutt was aware of the security code, should have suspected from Brown's demeanor that there, was something strange about him, and in fact spoke to Ms. Edwards before Brown left the store, instead of after. *See, e.g., Peek v. Oshman's Sporting Goods,* 768 S.W.2d 841, 847 (Tex.Ct.App.1989) (insufficient evidence to show genuine issue as to whether defendant sold firearm knowing or having reasonable cause to know that purchaser had been previously adjudicated mentally defective or been committed). As for Ms. Edwards, it is undisputed that while firmly believing that Mr. Brown was "crazy," she did not know that he had ever been committed or adjudicated mentally defective. *See* L. Edwards Dep. at 58–60.

The Court realizes that its conclusions here contradict the findings in *West v. Mache of Cochran.* In that case, having a purchaser fill out Form 4473 was not enough of an inquiry for the dealer later to claim convincingly that he had no way to know that the purchaser was mentally defective. The court stated that "[defendant's] protestations that there was no way it knew or could have known of [the purchaser's prior] adjudication of mental incompetence is likewise not persuasive, as this is precisely the information that proper use of the statutory procedure was intended to elicit." 187 Ga.App. at 368, 370 S.E.2d 169. The court viewed the "statutory procedure" as requiring dealers to have some kind of "safety procedures in place for such an eventuality [i.e., a deranged person attempting to purchase a weapon]." *Id.* at 369, 370 S.E.2d 169. The court quoted a Mississippi decision at length:

The defendants' conduct condemns them whichever way their argument goes. If we assume that by a reasonably careful questioning and observation by a mature, experienced dealer in firearms [the purchaser's] mental condition would have been suspected, then the defendants are clearly liable. *If we say that [the purchaser] could have masked his condition so that no layman could ever know anything about his condition, the defendants were likewise negligent.* That loaded [rifles] are especially dangerous and life threatening when possessed by mentally disturbed people is a matter of common knowledge, and firearms dealers should be especially cognizant of this. *Any such dealer should have in effect in his business some safeguard to see that a loaded [gun] is not placed in the hands of an unknown person, who may very well be a mental case, unless or until his background can be thoroughly investigated.*

*Id.* (quoting *Howard Bros. v. Penley,* 492 So.2d 965, 968–69 (Miss.1986)).

First, in this quotation the *Penley* court is not discussing the specific requirements of the Gun Control Act of 1968; it is discussing a dealer's duty of care under general principles of negligence, and that standard varies substantively from the language of the Gun Control Act. Second, the statement is far too broad. It establishes negligence in situations where a reasonable salesperson would have no idea that the purchaser has previously been institutionalized or adjudicated mentally incompetent. If the purchaser lies about his past and makes every effort to act calmly and rationally during the purchase, how is a dealer ever to know that this person is not what he or she appears to be? What "safeguards" could a dealer possibly put into place? How could she "thoroughly investigate" a purchaser's psychiatric history? With regard to past convictions, the dealer can simply consult a computer database; as to age, she can check identification. No such resources exist for prior psychiatric adjudications or commitments.

■ What could Wal-mart possibly tell a sales clerk, beyond telling her to use common sense and caution, that would allow her to assess whether there is reasonable cause to believe that a deceitful gun buyer has in the past been adjudicated mentally defective or been committed? The rule stated in *Penley* and adopted in *West* would make every licensed gun dealer negligent *per se* [5] every time a statutorily ineligible gun purchaser, no matter how deceitful, bought a firearm. The two decisions also do not address how a firearms dealer would go about regularly interrogating its customers about their private lives and stay in business for any length of time.

Neither court recommends viable procedures [6] that a dealer could adopt beyond these: 1) requiring every purchaser to fill out, initial and certify the federal form, which forces the buyer to swear that he or she has never been adjudicated mentally incompetent or been committed for mental incompetency, and 2) watching the purchaser closely for signs of mental distress or other warning signs. If warning signs are noticed—or even if they are not—the seller could 3) question the purchaser herself, and if she is not satisfied with the answers, refuse to sell. Nothing in the Gun Control Act requires more than this, or can reasonably be read to do so.[7] *See, e.g., Hetherton v. Sears, Roebuck & Co.*, 445 F.Supp. 294, 304 (D.Del.1978), *rev'd in part*, 593 F.2d 526 (3d Cir.1979), *remanded*, 493 F.Supp. 82 (D.Del.1980), *aff'd*, 652 F.2d 1152 (3d Cir.1981) (refusing to impose a "duty of investigation" on firearms dealers because its limits would be difficult to define and federal legislation gives no indication that such a duty was intended); *Phillips v. Roy*, 431 So.2d 849, 852 (La.Ct.App.1983) (advocating "a commonsense approach" to the problem of laypeople assessing mental competence, and suggesting that "the sales-person should spend a reasonable time in observing the customer, watching carefully for any signs of mental disturbance or instability which would tend to alert the average individual to the possibility of problems in this area and which would require some further inquiry, including consultation with one's superiors[.]").

The *Penley* case involved a store clerk handing a .357 Magnum pistol and ammunition to a customer before asking the customer any questions or requiring him to complete any forms. The customer, who was underaged, previously institutionalized, and high on drugs and alcohol, loaded the pistol right there and proceeded to fire at store employees and take a hostage. After a stand-off with police, he was captured. The clerk in *Penley* acted with a complete lack of care; this egregious conduct is probably what prompted the court to react so strongly in defining the defendant's duty in that case. The instant case does not support similar treatment: Mr. Brown spent fifteen minutes with Ms. Nutt, completing and initialing forms and producing identification. He was given no ammunition, and was not allowed to touch his (still unassembled) rifle until he left the building.

■ Because interpretation of the Gun Control Act is a federal question (in this Court under federal question jurisdiction), the Court need not defer to a prior state appellate decision on the issue, and here does not defer to *West v. Mache of Cochran*'s expansive reading of dealers' obligations under the Gun Control Act of 1968. Summary judgment is granted on the issue of Wal-mart's negligence *per se* under 18 U.S.C. § 922(d)(4).

### C. Wrongful Death

The Georgia wrongful death statute authorizes recovery by children of decedents

---

5. In Georgia, violation of the Gun Control Act is negligence *per se*. "Insofar as Georgia law is concerned, '[i]t has been uniformly held in this State that a violation of a penal statute [here § 922(d)(4)], resulting in injury, is negligence per se and authorizes recovery by the party injured, without other negligence.'" *West*, 187 Ga.App. at 367, 370 S.E.2d 169 (quoting *Spires v. Goldberg*, 26 Ga.App. 530, 532, 106 S.E. 585 (1921)).

6. The *Penley* court simply states that recommending legally sufficient safeguards is not its job. 492 So.2d at 968.

7. The House and Senate Reports on the Gun Control Act of 1968 do not elaborate on Congress' intentions concerning § 922(d)(4) (then § 922(g)). *See* [1968] *Cong. & Admin.News* at 4420.

where the death "results from ... criminal or other negligence[.]" O.C.G.A. § 51–4–1(2). Here, Plaintiff argues that Mr. Brown's death resulted from the negligence of Wal-mart employees. The statute has previously supported wrongful death claims where defendants were allegedly negligent in allowing or enabling decedents to commit suicide. *See, e.g., Merideth v. Grogan,* 812 F.Supp. 1223, 1231–32 (N.D.Ga.1992), *aff'd,* 985 F.2d 579 (11th Cir.1993) (denying summary judgment where allegedly inadequate monitoring by jail officials allowed decedent to kill himself); *Sneider v. Hyatt Corp.,* 390 F.Supp. 976, 979 (N.D.Ga.1975) (holding that, if hotels are considered to have a special relationships with guests, they may be liable for foreseeable suicide attempts). *Cf. McDay v. City of Atlanta,* 204 Ga.App. 621, 622, 420 S.E.2d 75 (1992) (holding that police officers' failure to prevent unforeseeable suicide by arrestee does not reveal any "malice, wilfulness, or corruption" stripping them of immunity under Georgia law).

■ The Court follows the traditional framework for negligence claims. The Plaintiff must demonstrate: 1) a duty owed by the defendant to the plaintiff; 2) a breach of that duty; and 3) that the breach was the proximate cause of injury to the Plaintiff; and 4) actual injury to the Plaintiff. *See, e.g., Galanti v. United States,* 709 F.2d 706 (11th Cir.), *reh'g denied,* 716 F.2d 914, *cert. denied,* 465 U.S. 1024, 104 S.Ct. 1279, 79 L.Ed.2d 683 (1983); *Anderson v. Radisson Hotel Corp.,* 834 F.Supp. 1364 (S.D.Ga.1993). Actual injury is proven; Mr. Brown, Bridgett Brown's father, is obviously deceased.

### 1. Duty

■ As for Wal-mart's duty in this case, numerous prior cases have clearly established it. With regard to the sale of a rifle to a mentally defective person, a firearm dealer should foresee that such a sale could easily result in irresponsible use of the firearm and thus injury to the buyer or third parties. The dealer clearly has a duty of care to the public to avoid such sales. *See, e.g., Decker,* 679 F.2d at 215 (finding duty); *West,* 187 Ga.App. at 369–70, 370 S.E.2d 169 (same); *Oshman's Sporting Goods,* 768 S.W.2d at 847

(same); *Splawnik v. DiCaprio,* 146 A.D.2d 333, 540 N.Y.S.2d 615, 616 (1989) (same); *Jacoves v. United Merchandising Corp.,* 9 Cal.App.4th 88, 11 Cal.Rptr.2d 468, 484, 487 (1992) (same, and listing cases); *Hetherton,* 445 F.Supp. at 303 (referring to gun dealers, observing that "[t]hose who possess dangerous instrumentalities, such as firearms, have a duty higher than that of ordinary care."); Prosser & Keeton, The Law of Torts 199 (4th ed. 1971). This duty is also recognized by numerous state ordinances and the federal law discussed above.

More specifically to cases of negligent entrustment, Georgia cases follow § 390 of the Second Restatement of Torts (emphasis added):

> One who supplies directly or through a third person a chattel for the use of another *whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it· in a manner involving unreasonable risk of physical harm to himself and others* whom the supplier should expect to share in or be · endangered by its use, is subject to liability for physical harm resulting to them.

*See, e.g., Pitts v. Ivester,* 171 Ga.App. 312, 313, 320 S.E.2d 226 (1984) (sheriff entrusts firearm to gas station attendant who then fires at patrons). *See also McBrayer v. Dickerson,* 192 Ga.App. 725, 725, 386 S.E.2d 173 (1989) (one child lends pistol to another, who accidentally kills a third). *See also Spires,* 26 Ga.App. at 536, 106 S.E. 585 ("A man who places in the hands of a child an article of a dangerous character and one likely to cause injury to the child or to others is guilty .of an actionable wrong[.]"). While most such cases involved entrustment to a minor, the analogy to mentally defective adults is an easy and logical one to make.

### 2. Issues of Fact

■ In this case there is a genuine issue of fact as to whether Nutt and Edwards knew enough to foresee that selling a gun to Brown could result in harm. It is crucial to note the correct parameters of foreseeability. To be legally negligent, Nutt and Edwards need not have foreseen the exact events that

later transpired. They need only have suspected that Brown "would take the [rifle] and commit an act with generally injurious consequences." *Edmunds v. Cowan,* 192 Ga.App. 616, 618, 386 S.E.2d 39 (1989). (citation omitted).

First, Lisa Edwards testified that a security alert had been issued in response to Eric Brown's entry numerous times in the past. L. Edwards Dep. at 48. This fact, along with the fact that an alert was issued when Brown entered the store on March 25, 1994, *id.* at 35, implies that Ms. Nutt, who had worked at Wal-mart for seven years, may have been aware that Brown was not a normal customer. Nutt protests to the contrary. *See* Nutt Affid. ¶ 27.

Second, there is a factual issue concerning Brown's physical appearance and demeanor that day. Roosevelt Bray testified that he saw Brown on his bicycle around 11:00–12:00 p.m., and that Brown was "looking real wild." Bray Dep. at 14. He looked so "wild," in fact, that Mr. Bray asked Brown if he was still "taking [his] medicine." Brown responded that "it wasn't doing him no good." *Id.* April Wilcox, a Wal-mart cashier, testified that just before purchasing the rifle Brown looked "rushed, upset, and ... was talking to himself." April Wilcox Affid. at ¶ 4. The Court finds it unlikely that Brown looked deranged that morning, was in a "rage" just before the purchase, *id.*, but looked completely normal while buying the gun.[8]

Third, there is no doubt that Lisa Edwards firmly believed that Brown was mentally disturbed, but it appears she assisted the sale anyway, by removing security tape from the rifle and returning it to Ms. Nutt with full knowledge that Brown had just purchased it. Edwards testified that before Brown was given his purchase, she told Ms. Nutt that the man was "crazy." Edwards says she questioned Nutt as to whether he should be sold a firearm. L. Edwards Dep. at 37. Ms. Nutt disputed this in her affidavit, stating that the exchange occurred *after* she returned from walking Brown out of the store.

Nutt Affid. ¶ 30. Nutt also testified that she did not "take [Ms. Edwards' comments] to mean [Brown] was unfit to purchase a firearm." *Id.*

Fourth, Lisa Edwards testified that after Nutt re-entered Wal-mart, she sought out a manager and left the building to look for Brown. Wal-mart omits mention of this in its statement of facts or Nutt's affidavit, but later asserts that if in fact Ms. Nutt did exit the building a second time, there is no evidence that she did so to look for Brown. If Nutt did leave the building to pursue Brown, this could easily imply to a reasonable trier of fact that she knew the sale was improper. This finding would be even more appropriate if a jury found that Ms. Edwards questioned Ms. Nutt about the sale before Nutt handed over the rifle to Brown. Neither Edwards nor Nutt took any further steps to retrieve the weapon, and they did not notify the police.

These four factual issues alone warrant denying Wal-mart's motion for summary judgment. For example, in *Phillips v. Roy,* the court reversed a grant of summary judgment to a gun dealer where the salesclerk denied knowing about the purchaser's mental problems, but the purchaser's mother and daughter testified that on the day of the sale he looked mentally disturbed. The court held that in light of this testimony a material issue remained as to the purchaser's demeanor and conduct at the time of sale. 431 So.2d at 852. *See also Rubin v. Johnson,* 550 N.E.2d 324, 330–31 (Ind.Ct.App.1990). *Phillips* contrasts with *Drake v. Wal-Mart,* 876 P.2d 738, 740 (Okla.Ct.App.1994), a decision cited by Wal-mart in this case. In *Drake* the court held that a salesclerk could not have foreseen a nineteen year old girl's suicide where she appeared seriously underweight, nervous, and "fidgety," looked "blank or vacant," and "acted as if she wasn't listening to" the salesclerk. *Id.* at 741. She told the clerk that she wanted the gun for self-defense. She did not know the type of gun she wanted, was reluctant to touch or handle

---

**8.** Lisa Edwards did not remember what Brown was wearing on March 25, 1994. L. Edwards Dep. at 45. April Wilcox said he was wearing a heavy coat, even though it was hot outside.

April Wilcox Affid. ¶ 4. Patricia Nutt said she observed nothing strange about Brown's behavior, but does not mention his appearance. Nutt Affid. ¶¶ 28–29.

weapons shown to her, and after the sale asked if she could cancel the sale and receive a refund. She then changed her mind once again, kept the weapon, and later killed herself with it.

*Drake* contains less evidence of the purchaser's mental imbalance than the instant case—here there is reason to suspect that Ms. Nutt knew, should have known, or was actually *told* that Brown was mentally deficient, and there is no doubt at all that Ms. Edwards believed Brown was deranged. This is sufficient evidence to defeat a motion for summary judgment even without·drawing all inferences in favor of the nonmovant. *Barnes,* 814 F.2d at 609. The *Drake* decision was also influenced by prior Oklahoma decisions, *e.g., Runyon v. Reid,* 510 P.2d 943 (Okla.1973), that obviously are not mandatory authority in Georgia.

### 3. Proximate Causation

In cases such as this, "the more difficult question" is always whether the ultimate injury "is so remote from the original wrong as to bring the case within the operation of the maxim *causa proxima, et non remota, spectatur.*" *Spires,* 26 Ga.App. at 536, 106 S.E. 585. That is, whether the defendant is a proximate cause of the decedent's suicide.

At first glance it appears that the link between Wal-mart's alleged negligent entrustment and Brown's suicide is tenuous—Brown lied on the federal form about his history of mental illness, bought the rifle, bought ammunition at another establishment, went home, assembled the rifle, and then shot himself. In its briefs Wal-mart argues that the criminal act of lying on the form, the purchase of ammunition at another store, and the suicide itself are all intervening acts cutting off liability for Wal-mart. Indeed, independent illegal acts of third persons are generally deemed unforeseeable and therefore the *sole* proximate cause of any injury. This then relieves other, prior negligent actors of liability. *See Andrews v. Kinsel,* 114 Ga. 390, 40 S.E. 300 (1901).

Several events did occur between the sale to Brown and his death, but they are not intervening acts absolving Wal-mart of liability as a matter of law. The reason for this is simply that if Brown's misuse of the weapon was foreseeable by the seller, so then (implicitly) were the intervening causes leading to that misuse, and so the seller can be held liable. It is basic common law that defendants remain liable where intervening acts between the negligence and the ultimate harm were foreseeable. In *Milton Bradley Co. v. Cooper* it was held that

> [I]n order to hold the defendant liable, the petition must show … that [the act complained of] put in operation other. causal forces, such as were the direct, natural and probable consequences of the original act, or that the intervening agency could have reasonably been anticipated or foreseen by · the. original wrongdoer.

79 Ga.App. 302, 307, 53 S.E.2d 761 (1949) (citations omitted). *See· also Aretz v. United States,* 604 F.2d 417, 432 (1979), *reh'g granted,* 616 F.2d 254·(5th Cir.1980) ("The negligence· of another party is not an intervening cause if the defendant had 'reasonable grounds for apprehending' the intervening negligence.") (citing *Milton Bradley*).[9] *Cf. Riesbeck Drug Co. v. Wray,* 111 Ind.App. 467, 39 N.E.2d 776 (1942) (finding no liability where there were no "conditions or circumstances" indicating to the seller that the instrumentality would be used to take human life). *See generally* Prosser & Keeton, The Law of Torts 303 (5th ed. 1984) (discussing principle and other cases). Foreseeable intervening forces are within the scope of the original risk created by the seller in transferring a firearm to a mentally imbalanced person, and they do not excuse him from liability.

Cases dealing with gun purchasers who then harm third parties hold that the gun seller may be held liable for foreseeable harm resulting from the sale, despite several intervening acts. *See Rubin,* 550 N.E.2d at 331–32 (where purchaser killed third party, intervening criminal act did not relieve de-

---

**9.** In the decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), the Eleventh Circuit adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

fendant of liability); *Decker*, 679 F.2d at 215 (Gun Control Act is evidence that Congress found it foreseeable that convicted felons would use firearms to commit crimes of violence); *K–Mart v. Keller*, 439 So.2d 283, 287 (Fla.Ct.App.1983), *review denied*, 450 So.2d 487 (Fla.1984) (discussing Gun Control Act, "[s]ince the irresponsibility and unpredictability of the recipient was the very reason that Congress forbade such a transfer, it can make no difference that the danger was actually realized[.]").

The legal analysis is no different in cases of suicide. If anticipated, it matters not whether the intervening act is negligent, intentional, or criminal, *Montgomery Ward & Co. v. Cooper*, 177 Ga.App. 540, 542–43, 339 S.E.2d 755 (1986), or whether it is the harming of another or the harming of ones' self. *See supra* part III.E.1 (discussing seller's duty of care). Wal-mart cites cases in which defendants were not held accountable in negligence for another's suicide, *Watters v. TSR, Inc.*, 904 F.2d 378 (1990), *Appling v. Jones*, 115 Ga.App. 301, 154 S.E.2d 406 (1967), but those cases are not persuasive. *Watters* actually enforces the point made here: the defendants in that case were relieved of liability partially because the suicide in question was not foreseeable. 904 F.2d at 383.

As for *Appling*, it holds that while one is liable for the foreseeable consequences of his negligence, he is not liable if the foreseeable consequence is a suicide. The court does not say how suicides can be distinguished in a principled manner from other foreseeable, intentional acts, for which defendants may presumably still be found liable. Some subsequent courts defer to a pure foreseeability approach, despite the holding in *Appling*. *See, e.g., Bornmann v. Great Southwest*, 453 F.2d 616, 623–24 (5th Cir.1971) (citing *Appling*, but then observing that "[t]he cases disapproving suicide as a 'new and independent cause' generally involve situations where the defendant knows of the suicidal risk[.]"); Ga.Digest 2d § 62(3) (listing recent cases). That is, they find that suicide does not relieve a defendant of liability for wrongful death when the defendant had reason to know of the risk of suicide. These cases usually involve defendants having, as Wal-

mart did here, a special duty to the public. The defendant in *Appling* had no duty to the public similar to the special obligations imposed on gun sellers. As discussed, *supra*, purveyors of firearms have a duty to anticipate certain kinds of intervening misconduct, like murder or suicide. *See Phillips*, 431 So.2d at 853 (asking rhetorically, "Is there any doubt that the salesperson who sold a weapon to a mental incompetent should have reasonably foreseen [the possibility of suicide]?"); *Bornmann*, 453 F.2d 616 (hospitals, which have special duty to patients, can be liable for patient suicide); Prosser & Keeton, *supra*, at 305.

*Appling* is also distinguishable from the instant case because it involves a defendant directly, negligently creating in the decedent the state of mind prompting suicide, not a defendant negligently providing a dangerous instrumentality to a decedent who is already contemplating the act. In the former cases, courts such as *Appling* rightly hold that suicide is a superseding legal cause, except in those cases where the defendant's acts created such a "rage or frenzy" in the decedent that he did not know what he was doing at the time of his self-inflicted death. The analysis is distinct from cases involving defendants with a special duty to foresee harm and avoid assisting those who are bent upon it.

■ Finally, the fact that another store sold Brown ammunition after the purchase at Wal-mart does not relieve Wal-mart of liability. The court in *Milton Bradley*, 79 Ga.App. at 306–07, 53 S.E.2d 761, observed that

[t]here may be more than one proximate cause of an injury. The proximate cause of an injury may be two separate and distinct acts of negligence of different persons acting concurrently. Where two concurrent acts of negligence operated in bringing about an injury the person injured may recover from either or both of the persons responsible. [citation omitted]

Plaintiff simply chose to sue Wal-mart instead of Horn's Bait & Tackle Shop.

There is an issue of fact as to whether Brown's suicide was foreseeable to a reasonably careful gun dealer. If so, the acts of lying on the federal form, buying ammunition, assembling the gun, and shooting him-

self in the head were all logical, foreseeable steps to that goal. Consequently, there is an issue of fact as to whether Wal-mart's alleged negligence legally caused Brown's death.[10] On the record before it, the Court cannot say as a matter of law that it did not.

### D. Damages

Wal-mart argues that neither punitive damages nor compensatory damages for Brown's pain and suffering are appropriate in this case. In their response brief to Wal-mart's motion for summary judgment, Plaintiffs agree and withdraw those damages claims. They stand dismissed.

### IV. Conclusion

Issues of proximate cause—and negligence generally—are properly left to triers of fact "unless the movant can demonstrate plainly and palpably that he did not contribute to the proximate cause of injury ... and that reasonable minds could not disagree." *Edmunds*, 192 Ga.App. at 619, 386 S.E.2d 39 (citing *Smith v. Southeastern Fidelity*, 258 Ga. 15, 16, 365 S.E.2d 105 (1988)). *See also Gauck v. Meleski*, 346 F.2d 433, 437 (5th Cir.1965); *Jones v. Crown Construction Co.*, 152 Ga.App. 578, 580, 263 S.E.2d 460 (1979); *Rubin*, 550 N.E.2d at 331. Here, even construed in a light most favorable to the Plaintiff, the evidence cannot support a finding that Wal-mart's employees were somehow aware or had reasonable cause to believe that Mr. Brown had in the past been adjudicated mentally defective or formally committed. Consequently, Wal-mart's motion for summary judgment on the issue of liability under the Gun Control Act of 1968 is **GRANTED**.

However, because there remain questions of fact about what Wal-mart's employees should have reasonably foreseen as a result of the sale of a rifle to Brown, Wal-mart's motion for summary judgment on the state law of wrongful death is **DENIED**.

As for Wal-mart's motion to strike portions of Plaintiff's affidavits, it is true that Federal Rule of Civil Procedure 56(e) requires affidavits to be based on personal knowledge and facts that would be admissible into evidence at trial. *See Rubin*, 550 N.E.2d at 327. Some of Plaintiff's affidavits violate both of these rules. The Court chooses not to formally strike specific sections, however; the questionable portions are not needed to support the Court's ruling today, and any objections to them may be made if they are submitted at trial. Consequently, the motion to strike is **DENIED**.

SO ORDERED.

---

10. The Court's finding here actually comports with the purpose of the Georgia wrongful death statute. It is designed to punish those who bring about the death of a human being by negligence.