(241 P.3d 134)
No. 102,570

ELIZABETH SHIRLEY, as Mother and Next Friend for ZEUS GRAHAM, *Appellant*, v. IMOGENE GLASS, BAXTER SPRINGS GUN & PAWN SHOP, and JOE and PATSY GEORGE, *Appellees*.

Opinion filed October 8, 2010.

*Jonathan E. Lowy*, of the Brady Center To Prevent Gun Violence, of Washington, D.C., and *James R. Shetlar*, of Law Offices of James R. Shetlar, P.A., of Overland Park, for appellant.

*James D. Oliver* and *Scott C. Nehrbass*, of Foulston Siefkin LLP, of Overland Park, for appellees.

Before MALONE, P.J., GREEN and BUSER, JJ.

GREEN, J.: This case involves a wrongful death action. The plaintiff's decedent 8-year-old son, Zeus Graham, died on September 5, 2003, as a result of gunshot wounds inflicted by her estranged husband, Russell Graham. Graham, Zeus' father, was a convicted felon and prohibited from purchasing a firearm. Russell shot Zeus with a 12-gauge New England shotgun and ammunition that his 77-year-old grandmother, Imogene Glass, had purchased that same day from the Baxter Springs Gun & Pawn Shop while accompanied by Russell, through an alleged straw-person sale. After shooting Zeus, Russell used the same firearm to fatally shoot himself.

In August 2005, the plaintiff, Elizabeth Shirley, as mother and next friend for Zeus, sued Glass, the alleged straw-person purchaser of the shotgun, and also Baxter Springs Gun & Pawn Shop and the pawn shop's owners, Joe and Patsy George. Shirley alleged that Glass had been negligent in recklessly purchasing a firearm for a known felon, in fraudulently representing that the firearm was for herself, in circumventing firearm protection laws, and in

failing to perform her fiduciary duty to Zeus. Shirley further alleged that the remaining defendants were negligent in selling a firearm to a party while knowing it was intended for another and in failing to perform a background check on the intended owner of the weapon. As the case proceeded through discovery, it was determined that Shirley's claims against the defendants were based on theories of negligence, negligence per se, negligent entrustment, and civil conspiracy.

In January 2007, the defendants, Baxter Springs Gun & Pawn Shop and the Georges, moved for summary judgment on all of Shirley's claims against them. The trial court granted the defendants' motion for summary judgment on all of Shirley's claims. Shirley later moved for and obtained a final order of dismissal with prejudice of her claims against Glass. Shirley now appeals from the trial court's order granting summary judgment to the previously mentioned defendants.

On appeal, Shirley contends that the trial court erred in granting the appellees, Baxter Springs Gun & Pawn Shop and the Georges, summary judgment on her claims of negligent entrustment, negligence per se, simple negligence, and civil conspiracy. Of Shirley's four claims, only one offers a potential avenue to establishing liability in this case: the negligent entrustment claim. As this case shows, Shirley's negligent entrustment claim requires us to decide whether the appellees breached their duty, that is, if a reasonable person would have foreseen that Russell would hurt Zeus or others with the shotgun that was purchased from the appellees. Because there remain questions of fact about what the appellees should have reasonably foreseen as a result of the sale of the shotgun to Glass, in what seems to have been a straw-person purchase of the shotgun, we determine that the trial court erred in granting summary judgment to the appellees on Shirley's negligent entrustment claim. In addition, we determine that the trial court properly granted summary judgment to the appellees on Shirley's claims of negligence per se, simple negligence, and civil conspiracy. Accordingly, we affirm in part, reverse in part, and remand for trial.

Russell and Zeus' mother, Shirley, had a tumultuous marriage and by September 5, 2003, Shirley lived separate from Russell and

had filed for divorce. Shirley testified that the first time Russell hit her was in 1999 when he thought that she was cheating on him. According to Shirley, Russell punched her in the arm and hit her on her legs and arms with a baseball bat. Shirley further testified that in 2000, Russell punched her on the side of her head with his fist. Then, in 2001, Russell punched her on the side of her head and on her arm. According to Shirley, Russell also slapped her across the face in 2002. Shirley testified that she did not receive any medical treatment or call the police to report those incidents.

Shirley moved out of the home she had shared with Russell on June 16, 2003. Approximately 1 week later, she received a phone call at work around midnight from Russell telling her that Zeus had been in an accident and that she needed to come get him. When Shirley arrived at Russell's home, Russell told her that he was leaving because Shirley had found someone else. Shirley testified that when she denied seeing anyone else, Russell punched her across the jaw with a closed fist, punched her five times on her left arm with a closed fist, and punched her twice in the center of her chest. Russell told Shirley that if she made any noise and woke up the boys, the last thing the boys would see would be Russell killing her. Zeus was asleep when this incident occurred. Russell also had another son, Alex, from a previous marriage, who was 2 years older than Zeus.

After Russell finished beating Shirley and walked out of his home, Shirley woke up Zeus and took him with her back to work and called the police. Shirley filed a protection from abuse request that day and was granted a protection from abuse order. According to Shirley, Russell was arrested for domestic violence the following day.

Shirley testified that around the beginning of August, a custody hearing was held that resulted in her having residential custody of Zeus, with Russell having visitation with Zeus every other weekend. Shirley dropped Zeus off at Russell's home on Friday, August 23, 2003, for a weekend visitation. According to Shirley, Russell whispered in her ear that if she did not move back in that Saturday, he was going to kill Zeus. Shirley testified that was the first time that Russell had threatened bodily harm to Zeus. After dropping off

Zeus, Shirley drove to the police station and made a report about the incident. Shirley testified that it was her understanding that two officers went to Russell's home, talked to Russell and Zeus, and concluded that they did not see any imminent danger. Shirley testified that she also contacted her lawyer, but he told her that Russell was probably just trying "to get a rise" out of her.

After the August 23, 2003, incident, arrangements were made for Zeus' weekend visitation exchange between Shirley and Russell to take place at the courthouse. Shirley testified that when she met Russell at the courthouse on September 5, 2003, to give him Zeus for the weekend, he did not say anything to her. Shirley later received a phone call from Russell around 11:45 p.m. on September 5, 2003. Russell told Shirley that he had gotten a shotgun and was going to kill himself. Russell told Shirley that if she came over and talked to him, she and Zeus would leave alive. According to Shirley, Russell stated that he would be sitting with a gun pointed at Zeus and that if any other person knocked on the door or if anyone came with her, he would shoot Zeus. Russell told Shirley that he had attempted to suffocate Zeus during the previous weekend visitation but that he had "chickened out."

When Russell called, Shirley was babysitting her boyfriend's daughter. Shirley testified that as soon as she got off the phone with Russell, she called her boyfriend at work, told him about Russell's phone call, and told him to come get his daughter. Shirley attempted to call Russell back, but she got the answering machine. When Shirley's boyfriend arrived, he stated that he had called the police and that they had instructed Shirley to stay there. Around 2 a.m., the police notified Shirley that Zeus had been killed.

An investigation revealed that earlier in the day on September 5, 2003, Russell had called his 77-year-old grandmother, Glass, and asked her to drive him to Baxter Springs Gun & Pawn Shop to buy a gun for Zeus and Alex. Russell told Glass that he had called the pawn shop that morning and that there was a gun there that he thought he could get for Zeus and Alex. Glass agreed to drive Russell to Baxter Springs to get the gun.

Glass testified that after she and Russell walked into the pawn shop, Russell told Joe George that he had called and wanted to see

the gun. Joe took them back to a cage area, took down a gun, and handed it to Russell. After looking at the gun, Russell handed it to Glass, and Glass handed it back to either Russell or Joe. According to Glass, Russell told Joe that the gun was about the right size for his two boys. Glass testified that she told Russell that he would need to get ammunition and a cleaning kit for the gun.

According to Glass, after Russell indicated to Joe that he wanted to purchase the gun, Joe asked him, "Have you been a good boy?" Glass testified that Russell replied, "No. I have a felony." Glass further testified that the next thing she knew Joe was handing her an ATF Form 4473, which is the federal form used to determine whether the buyer has a criminal or other record that prohibits him or her from buying a firearm.

Glass testified that she filled out part of Form 4473 and gave it back to Joe. According to the information on Form 4473, Glass purchased a 12-gauge New England Firearms single-shot shotgun, model SB1. Question 12(a) on Form 4473 asks: "Are you the actual buyer of the firearm(s) listed on this form?" In the box following 12(a), the response "yes" is handwritten. Immediately after the question in 12(a) the following warning is given: "**Warning: You are not the actual buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you.** *(See Important Notice 1 for actual buyer definition and examples.)*" It is apparent that Important Notice 1 was on the back of Form 4473.

According to Glass, she filled out items 1 through 11 on the front page of the form and signed the bottom of the form but did not recall answering any of the questions in items 12(a) through 12(l). Moreover, Glass testified that the handwriting in response to the questions in 12(a) through 12(l) was not hers. Glass further testified that she probably did not read the instructions on the back of the form because she was not purchasing anything. According to Glass, if Joe would have asked her if she was the actual buyer of the firearm, she would have told him no.

According to Glass, she never witnessed Russell acting violently towards anyone. Glass testified that she knew that Russell had a felony conviction for rape and had been in prison for approximately

6 years. Moreover, Glass testified that Russell had a hot temper but she never thought that Russell would be violent toward his sons.

Patsy George rang up the sale of the shotgun, ammunition, and cleaning kit. According to Glass, Russell stated that he was going to pay for it and took the money out of his pocket. Glass testified that Russell gave Patsy the money for the sale, and Patsy gave Russell some change. According to Glass, Russell carried the gun, ammunition, and cleaning kit out of the store. Glass further testified that when Russell got in the car, he had the sales receipt with him. Glass dropped Russell off at his home, and Russell took the gun with him. Glass testified that Russell had promised her that if she drove him to the pawn shop and if he purchased the gun, Russell would leave the gun at her house.

The Georges had a video monitoring and recording system at the pawn shop when the gun sale took place on September 5, 2003. Nevertheless, Patsy George testified that after they were contacted by the sheriff's deputy about Zeus' murder, they were unable to retrieve the surveillance videotape from September 5, 2003. The Georges stated that the recording system had malfunctioned and that the video recording system had "eaten" the tape.

Joe and Patsy George's deposition testimony about the gun sale differed significantly from that given by Glass. Joe testified that Glass told him that she was purchasing a gun for her great-grandson. According to Joe, he went back to the cage area and picked up a single-barrel shotgun, opened up the chamber, and handed it to Glass.

Joe testified that Glass told him that she brought her grandson along to inspect the gun because she did not know anything about guns. Joe testified that Russell looked down the barrel of the gun, closed it, and tripped the lever. According to Joe, Russell then told Glass, "Looks like a nice gun, it should be all right." Joe then reached out and took the gun from Russell. Joe testified that Glass then stated, "If that's all right, we'll take this one."

Joe testified that he stated, "Well, we'll see if grandma's been a good girl." According to Joe, this was a statement that he used to break the ice with his customers when he was getting ready to run

a background check. Joe denied ever asking Russell whether he had been a good boy. Moreover, Joe denied that Russell ever told him that he was a felon. Joe testified that as Glass was filling out Form 4473, Russell was away from the counter and was looking through tools in a junk tool bin. Joe further testified that he saw Glass answer items 12(a) through 12(l).

According to Joe, after Russell murdered Zeus and then committed suicide, Joe was interviewed by federal Special Agent Tierney of the Bureau of Alcohol, Tobacco, Firearms, and Explosives. Joe testified that Tierney indicated that when a person makes a phone call and then comes into the store and asks about ammunition and says that he wants to take his son dove hunting, that person should be the one filling out Form 4473. Joe testified that Patsy had been the one to talk with Russell when Russell called on the morning of September 5, 2003. Joe further testified that Patsy told him only that someone had called and was coming to look at a single-shot shotgun. According to Joe, although Russell had told him that he would like to take his son dove hunting and had talked with him about which shells to use, he never thought that Russell would be the one possessing the gun.

Joe submitted an affidavit that stated the following:

"It was my understanding . . . based on all of the verbal and nonverbal communications between me, the buyer of the gun, Imogene Glass, and the inspector of the gun (whom I've since been told was Russell Graham), that the gun was being purchased by Ms. Glass as a gift for a youngster or youngsters whom I understand to be her great-grandchild or great-grandchildren, for the purpose of going dove hunting."

Patsy testified that she received a phone call on the morning of September 5, 2003, from a man who said that he wanted to purchase a shotgun that he could use to take his child out dove hunting. According to Patsy, she told the man on the phone that she had two shotguns. Patsy testified that she stated that one of the guns had a bad trigger and that for his child's safety, the other gun would be more suitable to use to take his son dove hunting.

When Patsy was interviewed by Tierney, she initially told him that she thought that Glass had paid for the gun sale with a check. Nevertheless, she was unable to find Glass' check and eventually

remembered that the gun had been paid for with cash. Patsy testified she remembered that while she was at the cash register ringing up the sale of the gun and facing Glass, she turned to the side and noticed that there was money on the counter to pay for the sale. According to Patsy, she gave the change to Glass, and Glass waited for a receipt. Patsy testified that Russell picked up the shotgun and Glass picked up the ammunition and cleaning kit and they walked out of the store.

*Standard of Review*

On appeal, Shirley argues that the trial court erred in granting summary judgment to the appellees because she had established genuine issues of material fact as to her claims against them. This court's review over a trial court's decision on a motion for summary judgment is well established. When the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, the same rules apply; summary judgment must be denied if reasonable minds could differ as to the conclusions drawn from the evidence. *Miller v. Westport Ins. Corp.*, 288 Kan. 27, 32, 200 P.3d 419 (2009).

Summary judgment should be granted with caution in negligence actions. *Esquivel v. Watters*, 286 Kan. 292, 296, 183 P.3d 847 (2008). Nevertheless, summary judgment is proper in a negligence action if the defendant shows there is no evidence indicating negligence. *Edwards v. Anderson Engineering, Inc.*, 284 Kan. 892, 904, 166 P.3d 1047 (2007). Summary judgment is also proper in a negligence action if the only questions presented are questions

of law. *Smith v. Kansas Gas Service Co.*, 285 Kan. 33, 39, 169 P.3d 1052 (2007).

*Negligent Entrustment*

In granting summary judgment to the appellees on Shirley's negligent entrustment claim, the trial court determined that under Kansas law, the doctrine of negligent entrustment does not apply to the sale of a chattel. Shirley contends, however, that there was sufficient evidence to show that the Georges, by furnishing a gun to a man they knew or should have known posed a foreseeable risk when armed, could be liable on a theory of negligent entrustment under Kansas law.

Kansas courts have recognized claims of negligent entrustment where a supplier of a chattel has a duty to not give control of the chattel to a known incompetent person. The cause of action has four elements: (1) an entrustment of a chattel, (2) to a person incompetent to use it, (3) with knowledge that the person is incompetent, and (4) that it is the cause in fact of injury or damage to another. See *McCart v. Muir*, 230 Kan. 618, 620-21, 641 P.2d 384 (1982). As Restatement (Second) of Torts § 390 (1965) states:

"One who supplies directly or through a third person a chattel for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them."

In *Priestly v. Skourup*, 142 Kan. 127, 130, 45 P.2d 852 (1935), our Supreme Court recognized Restatement (First) of Torts § 390 (1934). This section quoted in *Priestly* is virtually the same as in the current Restatement (Second) of Torts § 390 (1965).

The negligent entrustment rule under Restatement (Second) of Torts § 390, imposes a special duty upon a supplier of a chattel not to give control of the chattel to a person whom the supplier knows is incompetent or incapable of handling the chattel. Restatement (Second) of Torts § 390, comment b, explains that the supplier of a chattel may not assume that a person will conduct himself or herself properly if the facts which are known or should be known

to the supplier should make the supplier realize that the person is unlikely to conduct himself or herself properly:

"[L]iability is based upon the rule stated in §§ 302, 302A, and 302B, and elaborated in Comment *j* under § 302, that the actor may not assume that human beings will conduct themselves properly if the facts which are known or should be known to him should make him realize that they are unlikely to do so. [O]ne who supplies a chattel for the use of another who knows its exact character and condition is not entitled to assume that the other will use it safely if the supplier knows or has reason to know that such other is likely to use it dangerously, as where the other belongs to a class which is notoriously incompetent to use the chattel safely, or lacks the training and experience necessary for such use, or the supplier knows that the other has on other occasions so acted that the supplier should realize that the chattel is likely to be dangerously used, or that the other, though otherwise capable of using the chattel safely, has a propensity or fixed purpose to misuse it. This is true even though the chattel is in perfect condition, or though defective, is capable of safe use for the purposes for which it is supplied by an ordinary person who knows of its defective condition."

Restatement (Second) of Torts § 390, comment b, further explains a supplier's liability under a negligent entrustment theory as follows:

"[If] the person to whom the chattel is supplied is one of a class which is legally recognized as so incompetent as to prevent them from being responsible for their actions, the supplier may be liable for harm suffered by him, as when a loaded gun is entrusted to a child of tender years. So too, if the supplier knows that the condition of the person to whom the chattel is supplied is such as to make him incapable of exercising the care which it is reasonable to expect of a normal sober adult, the supplier may be liable for harm sustained by the incompetent although such person deals with it in a way which may render him liable to third persons who are also injured."

Historically, Kansas courts have applied negligent entrustment principles to situations where an owner of a chattel has loaned or permitted access to the property by another. The majority of the cases involve an owner who has permitted a known reckless or incompetent person to use his or her vehicle. *Estate of Pemberton v. John's Sports Center, Inc.*, 35 Kan. App. 2d 809, 135 P.3d 174, *rev. denied* 282 Kan. 788 (2006).

In *Pemberton*, 35 Kan. App. 2d at 830, this court recognized that Kansas has never applied the negligent entrustment doctrine in the context of the *sales* of chattels. In fact, in *Kirk v. Miller*, 7 Kan.

App. 2d 504, 508, 644 P.2d 486, *rev. denied* 231 Kan. 800 (1982), this court held that once a vehicle is validly sold, the seller cannot be held to have negligently entrusted the vehicle to the buyer.

Nevertheless, the Restatement (Second) of Torts § 390, comment a, states that the negligent entrustment rule recited in that section "applies to sellers, lessors, donors or lenders, and to all kinds of bailers, irrespective of whether the bailment is gratuitous or for a consideration."

Moreover, although negligent entrustment claims generally occur in the context of a bailment, there is now wide support for the legal principle that merchants may be considered to be suppliers of chattels. See *Ireland v. Jefferson County Sheriff's Dept.*, 193 F. Supp. 2d 1201, 1229 (D. Colo. 2002); *Brown v. Wal-Mart Stores, Inc.*, 976 F. Supp. 729, 734 (W.D. Tenn. 1997). As a result, both state and federal courts have recognized that negligent entrustment claims may be maintained against persons who sell firearms and ammunition. See *Morin v. Moore*, 309 F.3d 316, 324-25 (5th Cir. 2002) (assault rifle); *Ireland*, 193 F. Supp. 2d at 1227-29 (shotgun); *Brown*, 976 F. Supp. at 734 (ammunition); *Knight v. Wal-Mart Stores, Inc.*, 889 F. Supp. 1532, 1539 (S.D. Ga. 1995) (firearms and ammunition); *Hamilton v. Beretta Corp.*, 96 N.Y.2d 222, 236-37, 727 N.Y.S.2d 7, 750 N.E.2d 1055 (2001) (firearms); *Wal-Mart Stores, Inc. v. Tamez*, 960 S.W.2d 125, 130 (Tex. App. 1997) (ammunition). Thus, the special duty under Section 390, to not give control of firearms or ammunition to a person whom the firearms dealer knows is incompetent or incapable of handling a firearm or ammunition or of using those items carefully, has been extended to firearms dealers.

Here, in order to establish a claim for negligent entrustment of a firearm or ammunition, Shirley must show that the appellees sold a shotgun and ammunition, in a straw-person purchase, to a person they knew or had reason to know would likely, due to his previous felony conviction, use the shotgun or ammunition or both in a manner that would cause an unreasonable risk of harm to himself or to others.

*Illegal Sale of Shotgun to Felon*

The first question is whether there is evidence in the record to create a genuine issue of material fact that the appellees, through a straw-person purchase, sold the 12-gauge shotgun and ammunition to Russell and that Joe George knew Russell was a convicted felon who could not legally obtain a firearm.

The United States Congress has established federal firearms laws that prohibit certain persons from being sold firearms and ammunition. Thus, by virtue of the federal firearms laws, certain persons are incompetent or not legally qualified to purchase firearms and ammunition. The particular federal firearms law that prohibits a firearms dealer from selling firearms and ammunition to felons is 18 U.S.C. § 922 (2000), which provides in relevant part:

"(d) It shall be unlawful for any person to sell or otherwise dispose of any firearm or ammunition to any person knowing or having reasonable cause to believe that such person—
"(1) is under indictment for, or has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year."

Anyone who knowingly violates 18 U.S.C. § 922(d)(1) is subject to fines and imprisonment of not more than 10 years. 18 U.S.C. § 924(a)(2) (2000).

In the present case, the evidence presented at the summary judgment stage was conflicting as to who was the actual purchaser of the gun and how much information Joe knew when making the shotgun sale. Although Joe testified that he believed Glass to be the purchaser, Glass testified that she was not the purchaser of the gun and did not pay any money for the gun. According to Glass, Russell had called the pawn shop on the morning of September 5, 2003, to ask about the shotgun, had mentioned to Joe his earlier call when he came into the pawn shop with Glass, had examined the gun and indicated to Joe that he wanted to purchase the gun, had paid for the gun, had taken the change and sales receipt, and had walked out of the pawn shop with the shotgun, ammunition, and cleaning kit.

According to Glass, it was only after Russell disclosed to Joe that he was a convicted felon that she was told to fill out Form 4473.

Joe testified that Agent Tierney indicated that when a person makes a phone call and then comes into the store and asks about ammunition and says that he wants to take his son dove hunting, that person should be the one filling out Form 4473.

Moreover, Shirley presented an affidavit from her expert witness, Scott Hattrup, who was a firearms instructor, a federal firearms licensee, and an attorney, which stated that he believed the firearm purchase in this case was a straw-person purchase and that the person who was actually purchasing the gun was Russell. Hattrup explained that a straw-person firearm purchase "is one where the purchaser and intended user or actual owner are different parties, usually because of some legal prohibition on the intended user or actual owner purchasing the firearm himself." Hattrup stated that he had reviewed Agent Tierney's interviews with the Georges and that it was apparent from those interviews that Tierney thought that the shotgun sale in this case was a straw-person purchase, with Russell actually purchasing the firearm.

In reviewing the evidence in the light most favorable to Shirley, the nonmoving party, we find that there was a genuine issue of material fact created as to whether the appellees illegally sold the 12-gauge shotgun and ammunition to a known felon, through a straw-person purchase, in violation of 18 U.S.C. § 922(d)(1).

In addition, there is evidence in the record establishing a genuine dispute of material fact as to whether the appellees violated 18 U.S.C. § 924(a)(1)(A) and 18 U.S.C. § 2(a) (2000), which prohibit aiding and abetting the knowing making of false statements or representations with respect to the information required by the Federal Firearms Act to be kept in the records of a federal firearms licensee "or in applying for any license or exemption or relief from disability" under the Federal Firearms Act. Glass testified that she did not purchase the gun and she did not recall filling out items 12(a) through 12(l) on Form 4473. Glass further testified that the handwritten responses to the questions in items 12(a) through 12(l) were not in her handwriting. Based on Glass' testimony, a reasonable inference could be drawn that the appellees knew that Russell was the actual purchaser of the shotgun and that either Joe or Patsy provided the answers to items 12(a) through 12(l).

Further, the fact that the appellees could not produce the videotape from the surveillance cameras that would have recorded the entire transaction on September 5, 2003, could lead to an adverse inference that the appellees had illegally filled out part of Form 4473 for Glass and that the transaction had occurred as Glass described it in her testimony. See *Interstate Circuit v. United States*, 306 U.S. 208, 226, 83 L. Ed. 610, 59 S. Ct. 467 (1939) (The production of weak evidence, when strong is available, can lead only to the conclusion that the strong would have been adverse.).

Although Shirley contends that the Federal Firearms Act created a private cause of action, we reject that contention. We address that contention in the next issue. Nevertheless, we determine that a jury may consider the Federal Firearms Act in relation to all of the other evidence in the case in determining the degree of care owed for the safety of the public and in measuring the appellees' conduct in the sale of the shotgun. See *Pullen v. West*, 278 Kan. 183, 204-06, 92 P.3d 584 (2004) (Our Supreme Court held that the trial court properly determined that the doctrine of negligence per se was inapplicable to this case. Nevertheless, our Supreme Court held that the trial court had improperly excluded any mention of the requirements of the National Fire Protection Association's standards to the jury.); see also *Martin v. MAPCO Ammonia Pipeline, Inc.*, 866 F. Supp. 1304-08 (D. Kan. 1994) (holding that evidence of Pipeline Safety Act and its regulations is admissible as evidence to show the appropriate standard of care and defendant's conformity with that standard, but cannot be considered conclusive proof of negligence or absence of negligence); *Robertson v. Burlington Northern R. Co.*, 32 F.3d 408, 410-11 (9th Cir. 1994) (violation of OSHA noise-level regulation did not establish negligence per se, but evidence of OSHA standards may be admitted as some evidence of applicable standard of care, as long as such evidence is considered in relation to all other evidence in case).

In fact, our Supreme Court in *Pullen* stated that "the NFPA 1123 standards were important to [the plaintiff's] case so that the jury could evaluate the degree of care owed when sponsoring or participating in a class B fireworks display, and the district court should have so instructed." 278 Kan. at 206. By the same token,

an argument can be advanced that had the appellees not sold the shotgun to Glass in a straw-person purchase, a violation of the Federal Firearms Act, Russell would have had no other means of obtaining a shotgun that day, and Zeus would not have been murdered by the use of that shotgun.

In short, Shirley is entitled to have the jury consider whether the appellees' sale of the shotgun and ammunition, through a straw-person purchase, to a person known to have been a convicted felon along with all of the other facts surrounding the gun transaction, was reasonable in light of Shirley's negligent entrustment claim.

*Foreseeability*

The more difficult question is whether there was enough evidence to establish foreseeability. In other words, was there evidence to show that the Georges knew or had reason to know that Russell would likely use the shotgun or ammunition or both in a manner that would cause unreasonable risk of harm to himself or to others?

In determining whether the defendant owed a duty to control the conduct of a third person, our Supreme Court has indicated there is no duty absent a showing the risk of harm was foreseeable. See *South v. McCarter*, 280 Kan. 85, 102-06, 119 P.3d 1 (2005); *Pemberton*, 35 Kan. App. 2d at 831. In addition, to prove legal causation under the proximate cause element, "the plaintiff must show that it was foreseeable that the defendant's conduct might create a risk of harm to the victim and that the result of that conduct and contributing causes were foreseeable. [Citation omitted.]" *Puckett v. Mt. Carmel Regional Medical Center*, 290 Kan. 406, 421, 228 P.3d 1048 (2010).

" ' "Foreseeability, for the purpose of proving negligence, is defined as a common-sense perception of the risks involved in certain situations and includes whatever is likely enough to happen that a reasonably prudent person would take it into account. [Citation omitted.] An injury is foreseeable so as to give rise to a duty of care where a defendant knows or reasonably should know that an action or the failure to act will likely result in harm." ' [Citations omitted.]" *South*, 280 Kan. at 103-04 (quoting *Gragg v. Wichita State Univ.*, 261 Kan. 1037, 1056, 934 P.2d 121 [1997]).

Generally, whether a duty exists in a negligence case is a question of law. 280 Kan. at 94. Nevertheless, "whether the risk of harm is reasonably foreseeable is a question for the trier of fact. Only when reasonable persons could arrive at but one conclusion may the court decide the question as a matter of law." *Long v. Turk*, 265 Kan. 855, 865, 962 P.2d 1093 (1998).

In this case, the evidence presented at the summary judgment stage showed many red flags that would have alerted a reasonably careful gun dealer that the sale of a shotgun to Russell would likely result in harm. For example, there was evidence that Russell had called earlier in the day about the shotgun and had selected a 12-gauge shotgun to purchase when he and Glass came into the pawn-shop. After Russell had selected the shotgun to be purchased, Joe George asked Russell if he had been "a good boy." Russell stated, "I have a felony." The Georges knew or should have known that Russell was prohibited by federal law from purchasing a gun. Yet, Joe George then turned to Ms. Glass and said, "[W]e'll see if grandma's been a good girl." Russell had already indicated to Joe George that he was the purchaser of the gun. A jury could infer that Glass was a straw-person purchaser, which is a violation of federal law. Moreover, Russell, not Glass, paid for the shotgun. There is also evidence that Russell received the change for the shotgun, took the sales receipt, and walked out the door with the ammunition and the shotgun in his hand.

As to Russell's previous felony conviction, the Georges should have asked more questions of Russell and Glass and attempted to ascertain the type of felony for which Russell had been convicted. Based on the highly suspicious circumstances in this case, that is, a 77-year-old grandmother accompanying a convicted felon to look at a 12-gauge shotgun, a reasonably careful firearms dealer should have asked additional questions to ensure that the firearm was not going to wind up in the hands of a violent person who was likely to do harm to others. Glass' testimony indicated that Russell's prior conviction may have been for rape, which is an offense that involves a defendant's physical conduct and can involve extreme violence against the victim in the commission of that crime. See K.S.A. 21-3502(a)(1)(A). If the Georges had found out that Russell had been

convicted of rape, then that information should have put them on high alert that Russell was potentially an extremely violent person attempting to purchase a firearm through his 77-year-old grandmother. Moreover, upon further questioning of Russell, the Georges might have also been able to ascertain that Russell was subject to a protection from abuse order against his estranged wife and that Russell had been recently arrested for domestic battery.

Instead, the evidence presented by Shirley shows that the Georges chose not to ask any of the previously mentioned questions. By choosing to disregard all of the warning signs surrounding this gun transaction and not making any inquiries of Glass and Russell, the Georges allowed Russell, a convicted felon who also had a recent history of violent criminal acts towards a family member, to gain control of a firearm that was later used by Russell to murder his 8-year-old son. In short, foreseeability is fairly obvious when an unsatisfactory answer to any of the previously mentioned questions would have been sufficient to refuse the sale of the shotgun.

The appellees maintain, however, that Russell's act of murdering Zeus was so far outside of the realm of foreseeability that liability cannot be imposed on them. With this argument, the appellees suggest that a defendant in a negligent entrustment case would have to be able to foresee the specific harm that ultimately occurred. Nevertheless, such a strict foreseeability standard is not and cannot logically be imposed in a case. In *South,* our Supreme Court stated that " '[a]n injury is foreseeable so as to give rise to a duty of care where a defendant knows or reasonably should know that an action or the failure to act *will likely result in harm.'* " (Emphasis added.) 280 Kan. at 103-04 (quoting *Gragg,* 261 Kan. at 1056). There is no requirement that the defendant's actions or failure to act will likely result in the specific harm that actually occurred.

Other jurisdictions have held that in order to be legally negligent, the defendants need not have foreseen the exact events that later transpired. They need only have suspected that the actor would take the gun and commit an act with generally injurious consequences. See *Knight,* 889 F. Supp. at 1539-40; *Edmunds v. Cowan,* 192 Ga. App. 616, 618, 386 S.E.2d 39 (1989). Similarly, foreseea-

bility does not require the actor to anticipate the precise manner in which injury will occur once he has created a dangerous situation through his or her negligence. *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992). "All that is required is 'that the injury be of such a general character as might reasonably have been anticipated; and that the injured party should be so situated with relation to the wrongful act that injury to him or to one similarly situated might reasonably have been foreseen.'" *Nixon v. Mr. Property Management*, 690 S.W.2d 546, 551 (Tex. 1985) (quoting *Carey v. Pure Dist. Corp.*, 133 Tex. 31, 35, 124 S.W.2d 847 [1939]).

Here, although the precise criminal act (Zeus' murder) committed by Russell may not have been foreseeable, there is evidence creating a genuine issue of material fact as to whether it was reasonably foreseeable that the appellees' conduct in selling the 12-gauge shotgun and ammunition to Russell, through a straw-person purchase, would result in the intentional misuse of the shotgun and serious harm to another person.

As a result, the foreseeability of Russell's improper use of the shotgun is a question of fact, and Russell's intervening criminal act of murdering Zeus does not as a matter of law supersede the appellees' liability. See *Puckett*, 290 Kan. 406, Syl. ¶ 10, ("If the intervening cause is foreseen or might reasonably have been foreseen by the first actor, his or her negligence may be considered the proximate cause, notwithstanding the intervening cause."); *Long*, 265 Kan. at 867 (holding that son's criminal act of killing an individual did not excuse father's liability for negligent entrustment of the gun); see also *Decker v. Gibson Products Co. of Albany, Inc.*, 679 F.2d 212, 216 (11th Cir. 1982) (holding that fact issue of whether gun dealer could have foreseen that ex-convict to whom he sold .38 caliber handgun would use gun to murder his former wife precluded summary judgment for gun dealer).

In summary, the disclosing by Russell of his felony conviction; the purchasing of the 12-gauge shotgun through a straw-person purchaser; the paying for the shotgun by Russell; the failing of the gun dealers to ask questions of Glass and Russell about the type of felony that Russell had committed; the lying of Glass (or Joe George) on the federal form; and the carrying of the shotgun by

Russell as he left the pawn shop were all logically foreseeable steps to Russell's goal of murdering or injuring Zeus or others or both.

Consequently, we determine that the previously mentioned facts support the existence of a special duty on the part of the Georges to protect Zeus or others from injury or harm. The appellees' failure to comply with the federal statutes justify submitting this case against the appellees on the grounds of common-law negligent entrustment. Moreover, because genuine issues of material fact exist, the trier of fact should determine whether the appellees breached the common-law duty of care under Restatement (Second) of Torts § 390 to Shirley. Finally, whether Zeus' death or injury to others was foreseeable and whether the appellees' illegal sale of the shotgun to Russell was the proximate cause of Zeus' death requires resolution by the trier of fact. See *Hale v. Brown*, 287 Kan. 320, 324, 197 P.3d 438 (2008). As a result, we determine that the grant of summary judgment on Shirley's claim of negligent entrustment was inappropriate.

*Negligence Per Se*

Shirley also argues that the trial court erred in granting summary judgment on her negligence per se theory when Zeus' murder was exactly the type of harm that the federal firearm statutes, 18 U.S.C. § 922 and § 924, and K.S.A. 21-4203 were intended to prevent.

Our Supreme Court in *Pullen*, 278 Kan. at 194, set out the elements of negligence per se as follows:

" 'The elements of negligence per se are (1) a violation of a statute, ordinance, or regulation, and (2) the violation must be the cause of the damages resulting therefrom. In addition, the plaintiff must also establish that an individual right of action for injury arising out of the violation was intended by the legislature.' [Citation omitted.]"

*Was there a violation of 18 U.S.C. § 922?*

Shirley alleges that the appellees violated 18 U.S.C. § 922(d)(1) when they illegally sold the shotgun to Russell, a felon who was subject to a domestic violence order. As discussed in the previous issue, the record in this case contains evidence creating a genuine issue of material fact as to whether the appellees violated 18 U.S.C.

§ 922(d)(1) by selling a firearm, in an alleged straw-person sale, to a known felon.

Shirley also alleges that the appellees violated 18 U.S.C. § 922(d)(8) by selling the shotgun to Russell when he was subject to a domestic violence protection order.

18 U.S.C. § 922(d)(8) provides in relevant part:

"(d) It shall be unlawful for any person to sell or otherwise dispose of any firearm or ammunition to any person knowing or having reasonable cause to believe that such person—

"(8) is subject to a court order that restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child, except that this paragraph shall only apply to a court order that—

"(A) was issued after a hearing of which such person received actual notice, and at which such person had the opportunity to participate; and

"(B)(i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or

"(ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury."

Nevertheless, the evidence in the record is insufficient to establish a genuine issue of material fact as to whether 18 U.S.C. § 922(d)(8) was violated. Although Shirley testified that she had requested and been granted a protection from abuse order, the actual order is not contained in the appellate record. Moreover, there is no other evidence to show that the requirements of 18 U.S.C. § 922(d)(8)(A) and (B) were met, which would have prohibited the appellees from selling a gun to Russell under that particular subsection.

*Did the violation of 18 U.S.C. § 922(d)(1) create a private right of action?*

Because there is a genuine issue of material fact as to whether the appellees violated 18 U.S.C. § 922(d)(1), the next question is whether the federal statute creates a private right of action. In order for a person claiming liability based on a statutory violation to recover damages, there must be an individual or a private right of action. A private right of action exists if the legislature intended

to give such a right. Whether a private right of action exists under a statute presents a question of law. *Pemberton*, 35 Kan. App. 2d at 816.

Kansas courts generally use a two-part test to determine whether the legislature's intention was to create a private right of action in a statute. First, the party must show that the statute was intended to protect a specific group of people instead of to protect the general public. Second, the court must review the legislative history of the statute to determine whether the legislature intended to create a private right of action. *Pemberton*, 35 Kan. App. 2d at 816.

Under the more recent federal decisions, federal courts, when determining whether Congress intended to create a private right of action, "must look for ' "rights-creating language" ' which ' "explicitly confer[s] a right directly on a class of persons that include[s] the plaintiff" ' and language indentifying 'the class for whose especial benefit the statute was enacted.' " *Pemberton*, 35 Kan. App. 2d at 816 (quoting *Boswell v. Skywest Airlines, Inc.*, 361 F.3d 1263, 1267 [10th Cir. 2004]).

It is important to point out that the doctrine of negligence per se in Kansas differs from the negligence per se recognized in other states. As explained by Professors William E. Westerbeke & Stephen R. McAllister in *Survey of Kansas Tort Law: Part I*, 49 U. Kan. L. Rev. 1037, 1053 (June 2001):

"In Kansas, the doctrine of negligence per se . . . recognizes the creation of an individual cause of action from a criminal statute or administrative regulation. An individual cause of action does not arise from every statute or regulation, but only from those which were enacted or promulgated with legislative intent to create an individual cause of action as opposed to a statute or regulation intended merely to protect the safety or welfare of the public at large. In every other state, the doctrine refers to the judicial process in negligence actions of taking a specific standard of care from a criminal statute or ordinance or from an administrative regulation that is in fact silent about issues of civil liability."

Courts in other jurisdictions have developed the following three-part test to be used in determining when a specific standard of care should be taken from a statute, ordinance, or regulation: (1) Does the statute, ordinance, or regulation protect a particular class of persons, and the plaintiff in that class? (2) Does the statute, ordi-

nance, or regulation seek to prevent a particular type of harm, which is the type of harm suffered by the plaintiff? and (3) Is the violation of the statute, ordinance, or regulation a proximate cause of the harm suffered by the plaintiff? Westerbeke & McAllister, *Survey of Kansas Tort Law: Part I*, 49 U. Kan. L. Rev., at 1057.

Under both the three-part test set out above and the two-part test set out in *Pemberton*, a court must determine whether the statute was intended to protect a particular group or class of people. Thus, if the statute was not intended to protect a particular group or class of people, then the plaintiff does not have a cause of action for negligence per se. Based on the analysis below, Shirley's claim would fail under either test because 18 U.S.C. § 922 was not designed to protect a specific group or class of people but instead was aimed at protecting society in general.

This court in *Pemberton* explained that 18 U.S.C. § 922 was enacted as part of Title IV of the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. 90-351, 82 Stat. 228 and was amended that same year by Title I of the Gun Control Act of 1968, Pub. L. 90-618, 82 Stat. 1216. Title IV of the Omnibus Crime Control Act noted the number of murders and crimes committed with guns. 1968 U.S.C.C.A.N. 2163-64. Congress was concerned that the firearms traffic moving in interstate commerce prevented the states from adequately controlling the firearms traffic within their borders. Moreover, the availability of firearms to criminals, juveniles, drug addicts, mental defectives, and militant groups was a significant factor in the prevalence of unlawful conduct and violent crime in the United States. As a result, restrictions on transfers and sales of firearms were deemed necessary. 1968 U.S.C.C.A.N. 2197-98. The Gun Control Act of 1968 amended Title IV to impose the same restrictions on subject rifles and shotguns as had been imposed on other firearms. 1968 U.S.C.C.A.N. 2197, 4412-13. 35 Kan. App. 2d at 817.

In determining that there was no private right of action under 18 U.S.C. § 922 based on the federal private right of action analysis, this court in *Pemberton* stated:

"Under the federal standard for determining a private right of action, there is no legislative language in 18 U.S.C. § 922 or the accompanying provisions which

can be classified as ' "rights-creating language" ' which explicitly conferred a right directly to a class of persons that includes the plaintiffs or language identifying the class for whose especial benefit the statute was enacted. See *Boswell*, 361 F.3d at 1267. As discussed above, the legislative history of the two federal enactments focuses on protecting the public *in general* from crime and violence created by the ready availability of firearms. While the laws were focused at keeping firearms out of the hands of felons and irresponsible persons, the protection was aimed at society in general. See *Huddleston v. United States*, 415 U.S. 814, 824-25, 39 L. Ed. 2d 782, 94 S. Ct. 1262 (1974) (discussing legislative history of § 922 in context of appeal from a criminal prosecution for unlawful possession). Based upon the federal private right of action analysis set forth in *Boswell*, no private right of action would exist under 18 U.S.C. § 922." 35 Kan. App. 2d at 817-18.

Further, in determining that no private right of action would exist under the Kansas analysis, this court stated:

"It is apparent that no private right of action would exist under Kansas' two-part analysis. The legislative history of 18 U.S.C. § 922 contains no implication that Congress was attempting to create a private right of action if the federal criminal statute was violated. Moreover, nothing in § 922 reflects that it was designed to protect a specific group of people. Instead, it clearly was enacted to protect the general public. [Citation omitted.]" 35 Kan. App. 2d at 820.

Shirley argues, however, that our Supreme Court in *Arredondo v. Duckwall Stores, Inc.*, 227 Kan. 842, 610 P.2d 1107 (1980), tacitly approved of a negligence per se action against a gun dealer involving violations of statutes virtually identical to those violated by the appellees. Nevertheless, *Arredondo* was an interlocutory appeal in which the issue was whether the Kansas comparative negligence statute applied in an action for personal injuries where liability was premised upon the violation of a statute prohibiting the sale of explosives to minors. 227 Kan. at 842. *Arredondo* did not involve the issue of whether the plaintiff could bring a negligence per se claim.

As pointed out in *Pemberton*, our Supreme Court in *Pullen v. West*, 278 Kan. 183, 199-201, 92 P.3d 584 (2004), held that violation of rules and regulations for the storage, use, and sales of fireworks and firecrackers did not create a private cause of action and could not be a basis for a negligence per se claim.

Based on this court's analysis in *Pemberton*, we determine that no private right of action was created by 18 U.S.C. § 922. As a

result, Shirley cannot pursue a negligence per se claim based on 18 U.S.C. § 922 against the appellees. See also *Bland v. Scott*, 279 Kan. 962, 972, 112 P.3d 941 (2005) (holding that plaintiff could not pursue negligence per se claim against defendant based on criminal statutes prohibiting furnishing liquor or cereal malt beverages to minor where legislature did not intend civil cause of action).

*18 U.S.C. § 924(a)(1)(A) and 18 U.S.C. § 2(a)*

Shirley alleges that the appellees also violated 18 U.S.C. § 924(a)(1)(A) and 18 U.S.C. § 2(a) by selling a firearm to a strawperson purchaser, whom they knew was not the actual buyer.

18 U.S.C. § 924 provides in relevant part:

"(a)(1) Except as otherwise provided in this subsection, subsection (b), (c), (f), or (p) of this section, or in section 929, whoever—

"(A) knowingly makes any false statement or representation with respect to the information required by this chapter to be kept in the records of a person licensed under this chapter or in applying for any license or exemption or relief from disability under the provisions of this chapter

. . . .

shall be fined under this title, imprisoned not more than five years, or both."

18 U.S.C. § 2(a), which is the aiding and abetting federal provision, states as follows: "Whoever commits an offense against the United States or aid, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

As in the previous analysis of 18 U.S.C. § 922(d)(1), there is no legislative language in 18 U.S.C. § 924(a)(1)(A) and 18 U.S.C. § 2(a) indicating that the legislature intended to create a private right of action. Moreover, as discussed in the previous analysis of 18 U.S.C. § 922(d)(1), the legislative history of the two federal gun control enactments focuses on protecting the public in general from crime and violence created by the ready availability of firearms, and there is nothing in 18 U.S.C. § 924(a)(1)(A) or 18 U.S.C. § 2(a) indicating that they were designed to protect a specific group of people. As a result, no private right of action exists under 18 U.S.C. § 924(a)(1)(A) or 18 U.S.C. § 2(a).

*K.S.A. 21-4203*

Shirley also maintains that she has a viable negligence per se claim under K.S.A. 21-4203.

K.S.A. 21-4203 provides in relevant part:

"(a) Criminal disposal of firearms is knowingly:

. . . .

"(3) selling, giving or otherwise transferring any firearm to any person who, within the preceding five years, has been convicted of a felony, other than those specified in subsection (b), under the laws of this or any other jurisdiction or has been released from imprisonment for a felony and was found not to have been in possession of a firearm at the time of the commission of the offense;

"(4) selling, giving or otherwise transferring any firearm to any person who, within the preceding 10 years, has been convicted of a felony to which this subsection applies, but was not found to have been in the possession of a firearm at the time of the commission of the offense, or has been released from imprisonment for such a crime, and has not had the conviction of such crime expunged or been pardoned for such crime;

"(5) selling, giving or otherwise transferring any firearm to any person who has been convicted of a felony under the laws of this or any other jurisdiction and was found to have been in possession of a firearm at the time of the commission of the offense;

. . . .

"(b) Subsection (a)(4) shall apply to a felony under K.S.A. 21-3401, 21-3402, 21-3403, 21-3404, 21-3410, 21-3411, 21-3414, 21-3415, 21-3419, 21-3420, 21-3421, 21-3427, 21-3442, 21-3502, 21-3506, 21-3518, 21-3716, 65-4127a or 65-4127b, or 65-4160 through 65-4164, and amendments thereto, or a crime under a law of another jurisdiction which is substantially the same as such felony."

Nevertheless, there is nothing in the record to establish a violation of K.S.A. 21-4203. The record does not contain the particular facts of Russell's prior felony conviction and does not show the statute under which Russell was convicted. Further, similar to the federal statutes, there is no language in K.S.A. 21-4203 indicating that the legislature intended to create a private right of action. In addition, Shirley cites to nothing in the legislative history indicating that the statute was designed to protect a specific group of people.

As a result, the trial court properly granted summary judgment in favor of the Georges on Shirley's negligence per se claim.

## Simple Negligence

Next, Shirley argues that the trial court erred in granting summary judgment to the appellees on her simple negligence claim. Shirley maintains that under our Supreme Court precedent in *Long v. Turk*, 265 Kan. 855, 962 P.2d 1093 (1998), and *Wood v. Groh*, 269 Kan. 420, 7 P.3d 1163 (2000), the appellees may be liable in negligence for the shooting that foreseeably resulted from their supplying a gun to a man whom they knew was a felon.

Quoting *Durflinger v. Artiles*, 234 Kan. 484, 488, 673 P.2d 86 (1983), our Supreme Court in *Gragg v. Wichita State Univ.*, 261 Kan. 1037, 1044, 934 P.2d 121 (1997), set out what a plaintiff must establish in order to prevail in a negligence action:

" 'Negligence exists where there is a duty owed by one person to another and a breach of that duty occurs. Further, if recovery is to be had for such negligence, the injured party must show: (1) a causal connection between the duty breached and the injury received; and (2) he or she was damaged by the negligence. [Citation omitted.] An accident which is not reasonable to be foreseen by the exercise of reasonable care and prudence is not sufficient grounds for a negligence action. . . . *Robertson v. City of Topeka*, 231 Kan. 358[, 644 P.2d 458 (1982)], recognized a special relationship between certain persons could give rise to a duty. *Whether a duty exists is a question of law.* [Citations omitted.] Whether the duty has been breached is a question of fact.' " (Emphasis added.)

## Highest Degree of Care

Relying on *Long* and *Wood*, Shirley contends that the appellees owed and breached their duty to use the "highest degree of care" to safeguard their gun. In *Long*, the defendant's 17-year-old son took the defendant's .357 Magnum handgun, shot through the window of a vehicle, and killed the vehicle's passenger. The defendant owned many handguns, which were kept in a locked safe. The defendant's son helped the defendant build the locked safe, and he knew where the keys were kept to the safe. The evidence was conflicting as to whether the defendant's son took the gun without the defendant's permission or whether his father gave him the gun for protection. There was some evidence suggesting that the defendant had given his son permission to carry the gun for protection on previous occasions. The decedent's mother brought a negli-

gence action against the defendant for failing to keep the gun out of his son's possession.

In reversing the trial court's decision to grant summary judgment to the defendant, our Supreme Court held that a factual question existed as to whether the defendant had exercised the "highest degree of care" to keep a dangerous instrumentality out of a minor's possession. 265 Kan. at 864. In so holding, our Supreme Court stated that a .357 Magnum handgun is a dangerous instrumentality and that the highest degree of care is required in safeguarding such a handgun. Moreover, "[t]he degree of care has to be commensurate with the dangerous character of the instrumentality, and a duty to exercise the highest degree of care never ceases." 265 Kan. 855, Syl. ¶ 1.

Explaining that *Long* concerned an adult's duty to keep certain handguns out of the possession of minors, Professors Westerbeke & McAllister stated in *Survey of Kansas Tort Law: Part I*, 49 U. Kan. L. Rev. 1037, 1064, as follows:

"The duty to keep certain handguns out of the possession of minors is not limited to the parent-child relationship, but is general. The defendant had a duty to keep the gun out of his son's possession even if he believed his son was able to use the gun responsibly, and he had a duty to secure the gun so that it would not fall into the possession of any minor child, not just his son. In other words, the breach of duty was the defendant's failure to secure the gun, not his failure to control his child. If the objective of the law is to keep such guns out of the possession of minor children, then the obligation should logically extend to all minor children, not just to those other than the owner's own minor children."

The next dangerous instrumentality case by our Supreme Court applying the "highest degree of care" standard was *Wood*. There, the defendant's minor son used a screwdriver to pry open his father's locked gun cabinet and to remove a .22 caliber handgun. The ammunition was stored in the cabinet along with the gun. The son took the gun with him to parties being held that night, drank alcoholic beverages at the parties, and practiced target shooting at one of the parties. At one of the parties, the gun accidentally discharged and wounded a friend.

Our Supreme Court held that the trial court erred in instructing the jury on reasonable care instead of the "highest degree of care"

standard to govern the father's storage of the gun. In so holding, our Supreme Court stated:

"Those who deal with firearms are always required to use reasonable care. This standard never varies, but the care which it is reasonable to require of the actor varies with the danger involved in his or her act and is proportionate to it. The greater the danger, the greater the care which must be exercised. Firearms are inherently dangerous instrumentalities and commensurate with the dangerous character of such instrumentalities, the reasonable care required is the highest degree of care." *Wood*, 269 Kan. 420, Syl. ¶ 3.

Our Supreme Court concluded that the parents owed the highest duty to protect the public from the misuse of the gun, a dangerous instrumentality, stored in their home. In reversing and remanding the case, our Supreme Court noted that there was evidence from which the jury could find a failure to use the highest degree of care because the father stored the gun and the ammunition in the same cabinet, the cabinet could be easily opened with a screwdriver, and the father knew his son had taken the gun target shooting on other occasions. 269 Kan. at 422, 426-27.

In reviewing our Supreme Court's decision in *Wood*, Professors Westerbeke and McAllister in *Survey of Kansas Tort Law: Part I*, 49 U. Kan. L. Rev., at 1064, noted that our Supreme Court did not explain how the "highest degree of care" standard differed from reasonable care:

"The supreme court emphasized that an important difference exists between the reasonable care standard used by the trial court and the 'highest degree of care' standard defining the duty to control dangerous weapons. Yet the court never explained how the 'highest degree of care' differs from reasonable care. *An examination of the 'highest degree of care' standard in the high power line cases in Kansas seems to suggest that 'highest degree of care' is simply another way to describe a reasonable care standard in which the heightened dangerousness of the instrumentality requires commensurately heightened precautions in order to satisfy reasonable care under all the circumstances.*" (Emphasis added.)

Although Shirley urges this court to extend the "highest degree of care" standard to the present case, both *Long* and *Wood* are distinguishable because they involved an adult's duty to safeguard handguns from minors. Based on the extreme dangerousness of the handgun stored in close proximity to a minor, the adult handgun owners (the parents) were required to exercise "the highest

degree of care" to keep the gun out of the minor's possession. In the present case, however, we are dealing with a gun seller who in the course of business regularly sells different types of guns to various individuals. While the heightened dangerousness of the gun would require the gun seller to exercise commensurately heightened precautions in order to satisfy reasonable care under all the circumstances, it would not require the gun seller to exercise the "highest degree of care" to protect the general public from the misuse of the gun. See, *e.g., Wood,* 269 Kan. at 427 (concluding that parents owed highest duty to protect public from misuse of gun stored in their home); *Long,* 265 Kan. at 864 (father had duty to keep gun out of his son's possession even if he believed his son was able to use gun responsibly).

If this court were to adopt the "highest degree of care" standard, it would make every licensed gun dealer negligent per se every time a statutorily ineligible gun purchaser, no matter how deceitful, bought a firearm. Moreover, this would impose a duty on a firearms dealer to investigate almost every firearms transaction because just requiring the purchaser to fill out, initial, and certify the federal form would be insufficient to meet the "highest degree of care" standard. For example, the "highest degree of care" standard might require a firearms dealer to investigate whether the firearms purchaser had other people living in the home, whether those people had any violent tendencies or prior felony convictions, whether there were any children in the home, whether the purchaser had a secure gun cabinet in which to lock away his gun, and whether the purchaser had received extensive gun safety education. Under the "highest degree of care" standard, it brings about a question whether a gun dealer may ever proceed at all with a gun transaction in the face of certain dangers. *Edgar v. Brandvold,* 9 Wash. App. 899, 901, 515 P.2d 991 (1973), *rev. denied* 83 Wash. 2d 1007 (1974).

Moreover, any limits placed on the duty to investigate would be difficult to define and federal legislation gives no indication that such a duty was intended. For example, what if the deceitful gun buyer is a straw-person purchaser or has in the past been adjudicated mentally defective or been committed? How could a firearms

dealer thoroughly investigate whether a purchaser is making a straw-person purchase for the first time or whether a purchaser has a mental history? No resources exist for a firearms dealer to use to catch a deceitful gun buyer in these two examples. The "highest degree of care" standard would establish negligence in situations where a reasonable firearms dealer would have no idea that the gun buyer is a straw-person purchaser or has previously been institutionalized or adjudicated mentally incompetent.

We determine that neither *Wood* nor *Long* requires the imposition of the higher standard of care that Shirley seeks to impose. As a result, Shirley's highest degree of care argument fails.

*Special Relationship*

Moreover, in granting summary judgment on Shirley's simple negligence claim, the trial court found that there was no special relationship or special duty in this case:

" 'Our prevailing rule in Kansas is that in the absence of a "special relationship," there is no duty of an actor . . . to control the conduct of a third person.' All such 'special relationships' involve situations in which the party owing the duty had the ability or right to control the person causing the harm. [*D.W. v. Bliss*, 279 Kan. 726, 735, 112 P.3d 232 (2005).] In this case, the only relationship between defendants and the person causing the harm, Graham, is that Graham was a customer—the purchaser of a firearm from defendants. Defendants had no ability or right to control Graham; defendants only had an obligation under federal and state laws not to sell Graham a firearm. However, *Pemberton* teaches that violation of the federal and state laws prohibiting the sale of a firearm to a convicted felon will not support a private right of action, i.e., such a violation does not constitute negligence. This court concludes that since violation of such statutes will not support a private cause of action, neither do they create a duty owed by defendants."

In Kansas, the general rule is that in the absence of a special relationship, there is no duty on a person to control the conduct of a third person to prevent harm to others. *Gragg*, 261 Kan. at 1045. "A special relationship may exist between parent and child, master and servant, [and] the possessor of land and licensees." *C.J.W. v. State*, 253 Kan. 1, 8, 853 P.2d 4 (1993).

Moreover, the existence of a special duty depends on the foreseeability of the harm or injury. *Gragg*, 261 Kan. at 1056-57; see also *Nero v. Kansas State University*, 253 Kan. 567, 571-72, 861

P.2d 768 (1993) (quoting *Durflinger*, 234 Kan. at 499). As a result, whether a special duty exists in this case depends, in large part, on the following: whether the appellees could have anticipated Russell's propensity to use the shotgun in an improper or dangerous way.

The parties in this case are not a parent and child, a master and servant, or a possessor of land and licensee. As discussed previously, however, Restatement (Second) of Torts § 390 imposes a special duty on the appellees to not give control of firearms or ammunition to a person whom the firearms dealer knows is incompetent or incapable of handling or using those items carefully. In the absence of the special duty created by Section 390, Shirley has not shown to this court that there is any special relationship or special duty here that would support a viable simple negligence claim under the particular facts of this case. As a result, we find that the trial court properly granted summary judgment to the appellees on Shirley's simple negligence claim.

*Civil Conspiracy*

Lastly, the trial court also granted summary judgment to the appellees on Shirley's civil conspiracy claim. Shirley argues that the evidence was sufficient to support a civil conspiracy claim that the Georges, along with Glass and Russell, agreed to provide Russell with a gun, through an illegal straw-person purchase, that was ultimately used to kill Zeus.

Our Supreme Court has held that civil conspiracy is an actionable tort in Kansas. *Stoldt v. City of Toronto*, 234 Kan. 957, 967, 678 P.2d 153 (1984). The elements of a civil conspiracy are:

" '(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds in the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof.' [Citation omitted.] Conspiracy is not actionable without commission of some wrong giving rise to a cause of action independent of the conspiracy." 234 Kan. at 967.

Shirley asserts that the independent wrong giving rise to the cause of action is the appellees' "negligent supply of the gun to [Russell], actionable under negligence, negligent entrustment, and negligence per se." Nevertheless, as the appellees point out, Shir-

ley's allegation of conspiracy makes no sense because, as this court observed in *Gillespie v. Seymour*, 19 Kan. App. 2d 754, 767, 876 P.2d 193, *rev. denied* 255 Kan. 1001 (1994), "it would be illogical to find a 'meeting of the minds' (conspiracy) to act negligently."

16 Am. Jur. 2d, Conspiracy § 51 recognizes that because negligence is not an intentional wrong, parties cannot engage in a civil conspiracy to be negligent:

> "Since one cannot agree, expressly or tacitly, to commit a wrong about which he or she has no knowledge, in order for civil conspiracy to arise, the parties must be aware of the harm or wrongful conduct at the beginning of the combination or agreement. Thus, civil conspiracy is an intentional tort requiring a specific intent to accomplish the contemplated wrong and because negligence is, by definition, not an intentional wrong, the parties cannot engage in civil conspiracy to be negligent."

Nevertheless, in her reply brief, Shirley appears to change her theory that negligence is the independent wrong underlying her conspiracy claim and argues that the appellees may be liable for their intentional wrongful conduct of illegally supplying a dangerous felon with a gun. The problem with this argument, however, is that the record does not contain evidence that there was ever an agreement or a meeting of the minds between Glass and the appellees to violate the federal firearms statute and illegally supply Russell with a gun. As a result, the trial court properly granted summary judgment to the appellees on Shirley's civil conspiracy claim.

Affirmed in part, reversed in part, and remanded for further proceedings on Shirley's negligent entrustment claim.

\* \* \*

MALONE, J., concurring: I agree with the majority that Elizabeth Shirley has a cause of action against Joe and Patsy George and Baxter Springs Gun and Pawn Shop under a theory of negligent entrustment that should have survived summary judgment. I also agree with the majority that Shirley does not have a cause of action against the defendants under a negligence per se theory based on current Kansas case law. However, I write separately to suggest

that the Kansas Supreme Court reevaluate the requirements for recovery under the theory of negligence per se in Kansas.

The doctrine of negligence per se is summarized as follows:

"Negligence per se is ordinarily found where the actor has violated a duty imposed by legislative enactment. Where a legislative enactment imposes a specific duty to protect the safety of others, the failure to perform that duty is negligence per se. Negligence per se serves to establish the existence of the defendant's breach of a legally cognizable duty owed to the plaintiff.

. . . .

"A finding of negligence per se, however, only subjects the defendant to possible liability; it does not establish liability. A showing is required that such negligence was a proximate cause of the injury or damages sustained." 57A Am. Jur. 2d, Negligence § 685.

Negligence per se is a form of ordinary negligence that results from violation of a statute. In order to recover damages under negligence per se, the plaintiff must establish that the defendant violated a statute enacted to protect public safety and the violation caused the plaintiff's damages. The defendant's violation of a safety statute creates a presumption that the defendant violated a legal duty to exercise ordinary care to the plaintiff. The negligence per se doctrine, as traditionally applied in most states, does not depend on the grant of a private right of action by the legislature.

Under Kansas law, the elements of negligence per se are (1) a violation of a statute, ordinance, or regulation and (2) the violation must be the cause of the damages resulting therefrom. In addition, the plaintiff must establish that an individual right of action for injury arising out of a violation of the statute was intended by the legislature. *Pullen v. West*, 278 Kan. 183, Syl. ¶ 3, 92 P.3d 584 (2004).

Kansas courts generally use a two-part test in determining whether a private right of action is created. First, the party must show that the statute was designed to protect a specific group of people rather than to protect the general public. Second, the court must review legislative history in order to determine whether a private right of action was intended. 278 Kan. 183, Syl. ¶ 4. If the plaintiff can prove that a statute, ordinance, or regulation was enacted to protect a specific group of people, the plaintiff must also

prove that he or she is a member of the protected class. See *Schlo-bohm v. United Parcel Service, Inc.*, 248 Kan. 122, Syl. ¶ 1, 804 P.2d 978 (1991). Kansas appellate courts generally will not infer a private cause of action where a statute provides criminal penalties but does not mention civil liability. *Pullen*, 278 Kan. at 199.

Thus, in order to recover under negligence per se in Kansas, the plaintiff must establish that the legislature intended to create an individual right of action arising from the violation of a statute. This has not always been a requirement under Kansas law. In *Noland v. Sears, Roebuck & Co.*, 207 Kan. 72, 483 P.2d 1029 (1971), the plaintiff sought to recover damages for personal injuries received when she fell down some steps at a department store. The plaintiff claimed the defendant failed to provide handrails for the steps in violation of the city building code. In holding the plaintiff's negligence per se claim should have been submitted to the jury, the Kansas Supreme Court stated: "It is the unquestioned rule of this jurisdiction that the breach of a duty imposed by law or ordinance constitutes negligence *per se,* providing a basis for the recovery of damages proximately resulting therefrom. [Citation omitted.]" 207 Kan. at 74-75. The court in *Noland* did not mention any additional requirement of an individual right of action for recovery under negligence per se.

In *Arredondo v. Duckwall Stores, Inc.*, 227 Kan. 842, 610 P.2d 1107 (1980), a 16-year-old boy was injured when his shotgun accidentally fired. The boy filed suit against the store that had sold him the gunpowder he used to load the shotgun shells, claiming that the sale violated K.S.A. 21-4209, prohibiting the sale of explosives to minors. The *Arredondo* court did not address the question of negligence per se. The issue on appeal was whether comparative negligence applies in a personal injury action where liability is based upon violation of a statute. The court examined the history of Kansas statutes concerning possession or sale of firearms, dangerous weapons, and explosives, and found "[t]he primary purpose of K.S.A. 21-4209 is to protect the general public. An incidental consideration is the protection of those classes enumerated—minors, alcoholics, addicts, felons." 227 Kan. at 849. Based on the purpose of the statute, the court concluded that the entire respon-

sibility for the harm did not fall on the store and the comparative negligence statute applied. 227 Kan. at 849-50.

In *Greenlee v. Board of Clay County Comm'rs,* 241 Kan. 802, 740 P.2d 606 (1987), the plaintiff sought to recover damages for wrongful termination of employment. One of the plaintiff's theories of recovery was that the defendant intentionally violated the cash-basis and budget laws, resulting in the loss of the plaintiff's job. Without citing any prior authority for support, the Kansas Supreme Court evaluated the plaintiff's claim as follows:

"Generally, the test of whether one injured by the violation of a statute may recover damages from the wrongdoer is whether the legislature intended to give such a right. While, in some cases, statutes expressly impose personal liability on persons or entities for violation of the provisions thereof, or for failure to perform specified duties, the absence of such express provisions does not necessarily negate a legislative intent that the statute shall affect private rights. The legislative intent to grant or withhold a private cause of action for a violation of a statute, or the failure to perform a statutory duty, is determined primarily from the form or language of the statute. The nature of the evil sought to be remedied and the purpose the statute was intended to accomplish may also be taken into consideration. The generally recognized rule is that a statute which does not purport to establish a civil liability but merely makes provision to secure the safety or welfare of the public as an entity is not subject to construction establishing a civil liability." 241 Kan. at 804.

By 1991, the requirement for the plaintiff to establish an individual right of action to recover under negligence per se had become entrenched in Kansas case law. In *Schlobohm,* the plaintiff was injured when she fell in the entranceway of a building. The plaintiff alleged the building contractor was negligent in the construction of the entranceway because it had an elevation differential of more than 1 inch between the threshold and the floor, which violated the city building code. In addressing the plaintiff's negligence per se claim, the Kansas Supreme Court stated:

"Review of our holdings in *Arredondo* and *Greenlee* shows that this court has limited the general rule espoused in *Noland.* Violation of a statute or ordinance alone does not establish negligence per se. In addition, *Arredondo* and *Greenlee* require the plaintiff to establish that an individual right of action for injury arising out of the violation was intended by the legislature. Statutes or ordinances enacted to protect the public at large, therefore, do not create a duty to individuals injured

as a result of the statutory violation and the doctrine of negligence per se is inapplicable." *Schlobohm*, 248 Kan. at 125.

There is currently a split of authority on whether recovery under negligence per se depends on the grant of a private right of action by the legislature. 57A Am. Jur. 2d, Negligence § 685. However, Kansas appears to be among the minority of states that require a plaintiff to establish that the legislature intended to create an individual right of action in order to recover under negligence per se. See Westerbeke & McAllister, *Survey of Kansas Tort Law; Part I*, 49 U. Kan. L. Rev. 1037, 1053 (2001) ("In Kansas, the doctrine of negligence per se appears to differ from the negligence per se doctrine recognized in every other state."). The two-part test used in Kansas in determining whether a private right of action is created is difficult to apply. First, the party must show that the statute was designed to protect a specific group of people rather than to protect the general public. Quite frankly, it is difficult to discern any rationale for placing such a limitation on recovery under negligence per se. Most statutes, ordinances, and regulations are enacted for the purpose of protecting the general public who might be harmed by the behavior the legislation seeks to prohibit.

The second part of the test used in Kansas in determining whether a private right of action is created is also problematic. Even if a party shows that a statute, ordinance, or regulation was designed to protect a specific group of people rather than to protect the general public, the court must also "review legislative history in order to determine whether a private right of action was intended." *Pullen*, 278 Kan. 183, Syl. ¶ 4. But this step is contrary to the basic rule of statutory construction that the court only examines legislative history to determine intent if the statute's language is unclear or ambiguous. See *Double M Constr. v. Kansas Corporation Comm'n*, 288 Kan. 268, 271-72, 202 P.3d 7 (2009). Furthermore, many negligence per se claims are based upon violations of municipal ordinances and building codes, which almost always have no legislative history to review.

The requirement for the plaintiff to establish that the legislature intended to create an individual right of action has led to some

inconsistent and curious results in Kansas case law. In *Schlobohm*, where the plaintiff was injured when she fell in an entranceway that violated the building code, the Supreme Court acknowledged the general rule that statutes or ordinances enacted to protect the public at large do not give rise to a cause of action for negligence per se. 248 Kan. at 127. Still, the court found that the building code section was enacted to protect a special class of individuals "who enter and exit doorways from injury caused by tripping over an improper elevation differential between the floor and threshold." 248 Kan. at 127.

In *Kerns v. G.A.C., Inc.*, 255 Kan. 264, 875 P.2d 949 (1994), the plaintiff, a 6-year-old child, fell into a closed swimming pool at a mobile home park and nearly drowned, sustaining serious injuries. The plaintiff sued under the doctrine of negligence per se, citing violations of city code provisions regarding the upkeep and maintenance of closed swimming pools. The district court allowed the plaintiff's negligence per se claim to go to the jury, and the plaintiff recovered damages.

On appeal, the Kansas Supreme Court stated the general rule that the violation of an ordinance, by itself, does not establish negligence per se. The plaintiff must also establish that an individual right of action for injury arising out of the violation was intended by the legislature. 255 Kan. at 281. However, the court held under the facts of the case that "the swimming pool ordinances were enacted to protect a special class of persons—those who gain access to a closed pool and require rescuing, a class which included [the plaintiff]." 255 Kan. at 282.

In *Schlobohm* and *Kerns,* the ordinances that were violated appeared to be enacted for the protection of the general public. Nevertheless, the Supreme Court managed to find a special class of persons that the ordinances were intended to protect. In *Kansas State Bank & Tr. Co. v. Specialized Transportation Services, Inc.*, 249 Kan. 348, 819 P.2d 587 (1991), a 6-year-old girl with Down's syndrome was molested by her school bus driver. There was evidence that the school district may have violated K.S.A. 1990 Supp. 38-1522, which required teachers, school administrators, and school employees to report any suspicion of sexual abuse to the

Department of Social & Rehabilitation Services. The district court instructed the jury, over the school district's objection, that a violation of the statute constituted negligence.

On appeal, the Kansas Supreme Court acknowledged that "[t]he purpose of the reporting statute is to provide for the protection of children who have been abused by encouraging the reporting of suspected child abuse and by insuring the thorough and prompt investigation of such reports." 249 Kan. at 372. Nevertheless, the court concluded that the jury instruction on negligence per se was erroneous because there was no individual right of action under the statute. 249 Kan. at 373. Pointing to the fact that the statute had been amended five times, the majority stated: "If the legislature had intended to grant a private right of action in K.S.A. 38-1522 it would have specifically done so." 249 Kan. at 373. Thus, although the legislature intended to protect a specific group of children by enacting K.S.A. 1990 Supp. 38-1522, the Supreme Court concluded there was no individual right of action under the statute.

Another inconsistent application of the doctrine of negligence per se in Kansas is found in *Pullen*, where the plaintiff sustained injuries during a Fourth of July fireworks display at the defendants' home. The plaintiff claimed the defendants violated Kansas statutes, rules, and regulations governing fireworks displays, in part, by failing to follow the rules and regulations of the National Fire Protection Association (NFPA) pamphlet No. 1123. On appeal, the Supreme Court held that the statutorily incorporated safety standards for fireworks displays did not support a cause of action for negligence per se because the regulations were enacted for the protection of the general public. But the court also held the district court committed reversible error by excluding any mention of the NFPA requirements to the jury because the standards were important for the jury in evaluating the appropriate standard of care in the plaintiff's claim for ordinary negligence. This holding blurs any meaningful distinction between negligence per se and ordinary negligence.

Returning to the present case, the evidence viewed in the light most favorable to Shirley established that the Georges sold a 12-

guage shotgun and ammunition to a known felon, through a straw-person purchase, in violation of 18 U.S.C. § 922(d)(1) (2000). Hours later, the convicted felon used the shotgun to kill his 8-year-old son. This is a classic fact scenario that supports a cause of action under the doctrine of negligence per se. The fact that the federal legislation is intended to protect the general public rather than to protect a specific group of people should not bar a claim under negligence per se. The additional requirement for a party to establish that the legislature intended an individual right of action for injury arising out of a violation of a statute makes it difficult if not impossible to recover under the doctrine of negligence per se in Kansas.

Under the doctrine of negligence per se, the defendant's violation of a statute enacted to protect public safety creates a presumption that the defendant violated a legal duty to exercise due care. But a finding of negligence per se only subjects the defendant to possible liability; it does not establish liability. The plaintiff must also show the defendant's statutory violation was a proximate cause of the injury or damages sustained by the plaintiff. 57A Am. Jur. 2d, Negligence § 685; *Noland*, 207 Kan. at 74-75. Furthermore, the Kansas comparative negligence statute, K.S.A. 60-258a, applies to any claim under negligence per se. *Arrendondo*, 227 Kan. at 849-50. There is no rational basis for requiring a party to establish that the legislature intended to create an individual right of action to recover under negligence per se. The Kansas Supreme Court should reevaluate this requirement. At the very least, the court should reevaluate the two-part test used in Kansas in determining whether a private right of action is created.